## AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT

I, Sherri Queener, being duly sworn and appointed as a Special Agent of the Federal Bureau of Investigation, hereby make the following statement, based on information obtained by myself, other Special Agents of the Federal Bureau of Investigation, Department of Health and Human Services Office of Investigations and the District of Columbia Medicaid Fraud Control Unit.

1. This Affidavit is made in support of an arrest warrant for **Larry Solomon.**

2. Your Affiant has been employed by the Federal Bureau of Investigation since October 5, 2003. Your Affiant has training in the enforcement of laws of the United States, including training in the preparation, presentation, service and execution of criminal complaints and arrest and search warrants. Your Affiant is currently assigned to the Health Care Fraud Squad CR-19, of the Federal Bureau of Investigation, Washington Field Office, Northern Virginia Resident Agency. Your Affiant's duties include, but are not limited to, investigations in the District of Columbia of health care fraud, mail and wire fraud, money laundering and false statements and false claims. The facts and information contained in this affidavit are based upon my personal knowledge of this investigation and the information conveyed to me by other Special Agents of the FBI, Department of Health and Human Service Office of Investigations (HHS) and the District of Columbia Medicaid Fraud Control Unit (MFCU) who are involved in this investigation. The information in this affidavit does not include each and every fact known to the government, rather it only includes the information necessary to prove that probable cause exists for an arrest warrant to be issued for Larry Solomon for violations of Title 18, United States Code Section 1035.

## MEDICAL BUSINESSES

3. On or about August 25, 1999, BPS Medical and Rehabilitation, P.L.L.C (BPS) was

incorporated in the District of Columbia by **Larry Solomon.** The purpose of the company was to engage in the practice of medicine, physical therapy, and physical rehabilitation and well as to provide health care to the public through one or more out-patient medical clinics.

4. On or about September 8, 1999, Diversified Medical and Associates, P.L.L.C (Diversified) was incorporated in the District of Columbia by Solomon. The purpose of the company was to engage in the practice of medicine, physical therapy, and physical rehabilitation as well as to provide health care to the public through one of more out-patient medical clinics.

5. Charles Potts and Solomon are listed as managers of both BPS and Diversified.

6. Solomon is a licensed physician's assistant and Potts is a licensed medical doctor.

7. Solomon and Potts originally opened a medical clinic at 212 8th Street NW, Washington, DC. The office later moved to 544 8th Street NE, Washington, DC, to 811 8th Street NE, Washington, DC and finally to 1647 Benning Road, Washington, DC.

8. After moving the clinic to 811 8th Street NE, Washington, DC, an idea surfaced to begin seeing patients in a home setting, therefore providing home health care to senior citizens. Around late 2002, BPS began to get patient referrals from senior citizen building managers and by word of mouth

9. In late 2002, Solomon and Potts began seeing patients at senior citizen buildings throughout the District of Columbia.

10. BPS and Diversified participate in federal healthcare programs, including Medicare (a medical insurance program that provides health insurance for persons over the age of 65, as well as certain persons with disabilities under the age of 65, without regard to financial means or income) and Medicaid (a medical insurance program that provides health insurance for certain persons with

low incomes and limited resources).

## MEDICAL BILLING & PATIENT CARE

11. Patients seen at senior citizen housing facilities had primary care providers. Potts and Solomon would act as intermediaries for the patients. Potts & Solomon would visit seniors in their homes and would check their blood pressure and heart rate and write prescriptions.

12. Potts & Solomon use BPS as the company which under they billed Medicare and Medicaid for the home health care visits to senior citizens.

13. Potts and Solomon applied for a group billing number with Medicare and were given identification number G00846 on or about June 17, 2002. When billing under the group number, each provider used a personal identification number (pin); Potts 00B120B46 and Solomon 00B121B46. Each also had a unique personal identification number (upin), which was permanently assigned to them; Potts H27078 and Solomon P56139.

14. In a question listed on the Medicare application which stated "have you, under any current or former name or business identity, ever had any of the adverse legal actions listed Table A..." Solomon answered no. Table A lists "any felony or misdemeanor conviction, under Federal or State law, related to: (a) the delivery of an item or service under Medicare or a State health care program...". On or about December 5, 1989, Solomon was excluded from the Medicare program for a time period of five years due to a prior conviction.

15. On or about July 12, 2002, Trailblazer Health Enterprises LLC (the Medicare carrier), Benefit Integrity Unit contacted Program Safeguard Contractor Investigator Carrie A. Ruiz to report that they had received 15 beneficiary complaints in which the individuals complained that they were billed for services not provided or provided only once when there were multiple billings. The

complaints suggested that providers Potts & Solomon visited senior living centers and billed for home visits using procedure code 99349.

16. Billing code 99349 is defined by the American Medical Association, Current Procedural Terminology (CPT) as a "home visit for the evaluation and management of an established patient, which requires at least two of three key components which include a detailed interval history, a detailed examination or medical decision making of moderate complexity....usually, the presenting problem(s) are moderate to high severity. Physicians typically spend 40 minutes face-to-face with the patient and/or family."

17. The CPT defines moderate severity as "a problem where the risk of morbidity without treatment is moderate; there is moderate risk of mortality without treatment; uncertain prognosis OR increased probability of prolonged functional impairment". High severity is defined as "a problem where the risk of morbidity without treatment is high to extreme; there is moderate to high risk of mortality without treatment OR high probability of severe, prolonged functional impairment".

18. Reimbursement by Medicare for services rendered is higher for a physician than that of a physician's assistant.

19. Interviews of individuals that had filed complaints to Trailblazers as well as other patients who were interviewed by agents of the FBI, HHS and MFCU resulted in information that suggested that BPS charged beneficiaries for services never rendered, charged for procedure codes which entail a minimum range of 25 to 75 minutes of service but performed only five to ten minutes of services at most, charged for home care services while individuals were under hospital care and charged for a physician's visit when in fact it was actually a physician assistant visit. Specifically:

20. Cooperating witness #244 was billed for a home service on June 14, 2004. On that date, CW

#244 saw Solomon in the building as he/she was leaving for lunch. CW #244 was billed for a service even though no service was provided to him/her on that date. CW #244 does not see Solomon more than once a month. Billing data shows claims billed under Potts' and Solomon's pins, for more than one visit a month.

21.     According to Cooperating witness #197, Solomon represents himself as a doctor. Solomon visits CW #197 once a month and takes his/her blood pressure. On occasions, Solomon takes everyone's blood pressure in the building cafeteria. CW #197 is under the assumption that the blood pressure screenings are free. Billing data shows that claims for visits made to CW #197 are billed using CPT code 99349.

22.     Solomon visits cooperating witness #133 every month and takes his/her blood pressure and heart rate. Solomon visits CW #133 for approximately five minutes. CW #133 was billed for services by BPS on February 13, 2003. CW #133 was in the hospital on that date. Visits made to CW #133 were billed using CPT code 99349.

23.     Cooperating witness #562 has been seeing Solomon for several years. Solomon routinely stops by CW #562's apartment at the beginning of the month. Solomon checks CW #562's blood pressure and heart rate. The visits last no more than five minutes. CW #562 has been billed for services for more than once a month. Services billed for home care visits to CW #562 are done using CPT code 99349.

24.     Cooperating witness #801 was visited by Solomon on one occasion, at which time Solomon checked CW #801's blood pressure and heart rate. The visit occurred in CW #801's building recreation room. CW #801 was also visited by Solomon's nurse on one occasion who checked his/her vitals. CW #801 was only visited by Solomon or his nurse on two occasions but was billed

by BPS for a total of 33 visits. 27 visits were billed under Potts' pin number. The other six visits were billed under Solomon's pin number. CW #801 was also billed for a home service visit on a date he/she was hospitalized at Washington Hospital Center.

25. Cooperating witness #5 met Solomon in late 2003 and advised that Solomon visits his/her building once a month to see patients. Solomon checks CW #5's blood pressure and lungs. The visits do not last longer than five minutes. On or about November 22, 2004, Solomon knocked on CW #5's door at which time Solomon was let in. Solomon prescribed CW #5 with a prescription for Motrin 800mg. Solomon did not do an exam on CW #5 and appeared to be in a hurry. On November 23, 2004, Solomon visited CW #5 and asked him/her if he/she had gotten their prescription. On or about December 14, 2004, CW #5 saw Solomon in his/her building. Solomon did not provide a service to CW #5. On or about January 19, 2004, Solomon knocked on CW #5's door and asked him/her how he/she was feeling. CW #5 told Solomon that he/she did not need anything and Solomon left. Billing claims data shows that claims for service on November 23, December 14, 2004 and January 19, 2004 were billed using Potts' pin number at CPT code 99349.

26. Cooperating witness #2, a senior citizen building manager, has received complaints from residents that he/she manages regarding being billed for services that were not rendered by Solomon. CW #2 has observed Solomon taking resident's blood pressure in the facility's community room.

27. Cooperating witness #3, a senior citizen building manager, has received complaints from residents that he/she manages regarding being billed for services that were not rendered or being billed for a service when Solomon simply asked the residents how they were feeling and checked their vital signs.

28. Cooperating witness #4, a coordinator for several senior citizen buildings received complaints from residents that Solomon never saw them even though they were billed for a service, Solomon billed some residents for a service when they were out of town and that Solomon billed residents for a service when Solomon simply wrote the resident a prescription.

29. Cooperating witness #1 had conversations with Solomon regarding Solomon billing patients as being seen by a physician and not a physician's assistant. CW #1 told Solomon not to bill under a physician's number about ten times over the years.

30. On or about June 11, 2004, Potts and Solomon entered in to a business agreement regarding patient territories. The agreement in writing stated that Potts would turn over all of his patients and the right to treat the patients in several senior citizen homes in the District of Columbia. For the turnover of the territories, Potts would be compensated for a sum of $36,000, paid in monthly installments of $3,000 for 12 months. Potts no longer sees patients in senior citizen buildings and is only seeing patients in a group home setting.

31. Billing data for the time period of July 1, 2004 to December 31, 2004, shows that the majority of patients billed under the group number for BPS for home visits, were billed under Potts' pin number, 00B120B46, to include patients that were not seen by Potts due to the agreement made in June of 2004 and for other senior citizen homes that Potts did not visit in the year of 2004.

## MEDICARE CLAIMS ANALYSIS

32. A review of Medicare data has revealed that BPS billed Medicare for services rendered to approximately 16 beneficiaries who were dead. A review of Medicaid data revealed that BPS billed Medicaid for serviced rendered to approximately three beneficiaries who were dead at the time.

33. A review of monthly and daily analysis of Medicare data, showed that on numerous days,

Solomon billed for services for a large number of patients at CPT code 99349, a 40 minute visit. On August 26, 2003, Medicare was billed under Solomon's pin number of 00B121B46 for 43 patients, all under CPT code 99349, which would have resulted in Solomon having to work 28.6 hours that day.

34. On September 22, 2003, Medicare was billed under Solomon's pin number of 00B121B46 for 72 patients at CPT code 99349, a 40 minute visit, which would result in Solomon having to work 48 hours that day.

35. On October 8, 2003, Medicare was billed under Solomon's pin number of 00B121B46 for 67 patients at CPT code 99349, a 40 minute visit and 1 patient at CPT code 99350, a 60 minute visit, which would result in Solomon having to work 45.6 hours that day.

## SURVEILLANCE

36. A review of monthly analysis of Medicare data shows that billing under Solomon's pin number of 00B121B46 decreased significantly starting at the beginning of 2004. Billing data revealed that Solomon would not work weeks at a time. Specifically, monthly analysis showed that Solomon only billed for two patients using his pin number, 00B121B46 in November of 2004 and one patient in December of 2004.

37. Interviews and surveillance has revealed that Solomon had been present at senior citizen housing facilities during the months of November and December and that billing data shows that services rendered by Solomon were actually billed under Potts' pin number.

38. On or about July 9, 2004, Solomon was seen at 2855 Bladensburg Rd NE, Washington, DC. A copy of the sign in sheet for the building shows Solomon signing in at 10:00 and leaving at 11:15 for "medical round." Analysis of Medicare billing data for that date shows services were billed to

16 patients at 2855 Bladensburg Rd. NE, using Potts' pin number at CPT code 99349 despite the fact that Solomon was the individual seen in the building. Billing for 16 patients at 40 minutes a piece would have required Solomon to be at 2855 Bladensburg Rd. NE for 10.6 hours.

39. On or about November 22, 2004, November 23, 2004, December 14, 2004 and January 19, 2005, Solomon was observed at 1845 Harvard Street NW, Washington, DC. Billing data for those dates shows that services were billed using Potts' pin number at CPT code 99349 despite the fact that Solomon was the individual seen in the building.

40. On or about November 22, 2004, Solomon was observed at 3001 Bladensburg Rd. NE, Washington, DC. Billing data for the date shows that services were billed using Potts' pin number at CPT code 99349 despite the fact that Solomon was the individual seen in the building.

## MONEY LAUNDERING

41. Title 18 United States Code Section 1956(a)(1) prohibits knowingly conducting or attempting to conduct a financial transaction using proceeds of specified unlawful activity with the intent to conceal or disguise proceeds or promote the carrying on of the specified unlawful activity.

42. Title 18 United States Code Section 1956(c)(7)(F) defines specified unlawful activity to include any act or activity constituting an offense involving a Federal health care offense.

43. From March 19, 2001 to June 1, 2004, approximately $323,005.41 has been sent by way of United States mail from Medicare made payable to Charles Potts, of which $262,337.83 was deposited into BPS, Diversified or other bank related accounts for services rendered. Beginning on or about October 16, 2002, reimbursement for services rendered by BPS Medical were electronically transferred by Medicare to Wachovia Bank account number xxx2054. From October 16, 2003 to January 31, 2005, approximately $1,242,360.21 has been electronically transferred to Wachovia

9

account number xxx2054 by Medicare.

44. Reimbursement for services rendered by BPS is sent by Medicaid to BPS by way of check via the United States mail service. From May 15, 1999 to January 2, 2005, approximately $322,693.34 has been mailed to Medicaid to BPS or Diversified for services rendered of which $103,441.05 was deposited into BPS, Diversified or other bank related accounts. Approximately $37,013.65 has been electronically transferred to xxx2054 by DC Medicaid.

45. A review of Wachovia Bank account number xxx2054 revealed electronic payments from Medicare as well as a signature card which lists Solomon, Potts and others as individuals who are signatories on the account.

46. A review of Medicare claims records shows that on November 22, 2004, Medicare was billed for services rendered to individuals who lived at 3001 Bladensburg Road, using the pin number for Potts despite the fact that Solomon was seen in the building. According to Medicare claims records, BPS was paid for the services rendered at 3001 Bladensburg Road on the dates of December 2 and 6, 2004 through the form of electronic payment number 880408489 and 880409219. As a result of the electronic payment, $2,016.09 was transferred to Wachovia Bank account number xxx2054 on December 6, 2004 and $1,116.50 was transferred to Wachovia Bank account number xxx2054 on December 8, 2004. A review of bank records show that the payments were in fact electronically deposited into Wachovia Bank account xxx2054.

47. Investigation has revealed that the proceeds from Medicare and Medicaid which were deposited in to BPS Wachovia Bank accounts, were then transferred through other various Wachovia Bank and Southtrust Bank accounts under names of medical and non-medical companies that Solomon was involved with.

48.  The following Wachovia Bank accounts have received funds, whether through wire transfers and/or deposits from the BPS or Diversified Accounts where the original Medicare and Medicaid deposits were made:

| BANK | ACCOUNT NAME | ACCOUNT NUMBER |
| --- | --- | --- |
| Wachovia Bank NA | BPS Medical & Rehab Clinic | xxx2054 |
| Wachovia Bank NA | BPS Medical & Rehab General | xxx5714 |
| Wachovia Bank NA | BPS Medical & Rehab DMA Expense | xxx5730 |
| Wachovia Bank NA | POTSOL Crozier Expense Account | xxx3152 |
| Wachovia Bank NA | BPS Solomon Expense | xxx1899 |
| Wachovia Bank NA | POTSOL Payroll Account | xxx5044 |
| Wachovia Bank NA | POTSOL Management Services, Inc. | xxx4626 |
| Wachovia Bank NA | Solomons Administrative And Medical | xxx9658 |
| Wachovia Bank NA | Solomons Administrative and Medical B. Solomon Expense Account | xxx9439 |
| Wachovia Bank NA | Solomons Administrative and Medical Expense Account | xxx5633 |
| Wachovia Bank NA | Diversified Medical and Associates | xxx1678 |
| Wachovia Bank NA | Diversified Medical and Associates | xxx1805 |
| Wachovia Bank NA | Diversified Medical and Associates - Payable | xxx1876 |
| Wachovia Bank NA | Diversified Medical and Associates | xxx2248 |

49.  Solomon is listed as a signature on all but one of the Wachovia Bank NA accounts listed above.

50.  According to cooperating witness #1, revenue generated from the medical practice, which

11

was mainly from Medicare and Medicaid, were then used by Solomon to fund other projects which included a food warehouse, a computer store and a clothing venture. Cooperating witness #1 further advised that none of the other business ever generated a profit.

51.     The investigation has revealed that Solomon's daughter received money by way of electronic transfers from account listed above, for non medical businesses that were located in Alabama. The businesses included **Tasty Treats, Katies Computer Store** and **Katies Fashions.**

52.     An analysis of bank records revealed that from the time period of June 1999 to December 2004, Solomon used funds from the above mentioned bank accounts for payment for such things as mortgages, cars, rental agreements, credit cards, and insurance policies. Transactions were also made on the above mentioned accounts for everyday expenses including payments to restaurants, video stores, and other everyday expenses. Money was also transferred to Southtrust Bank accounts for non medical companies that Solomon was involved with. Examples are as follows:

| Item | Accounts Used to Pay Item | Amount |
| --- | --- | --- |
| Mortgage:<br>11315 & 11010 Old Prospect Hill Road, Glenn Dale, MD | BPS (xxx2054)<br>SAMS (xxx9658)<br>BPS Solomon Expense (xxx1899)<br>POTSOL (xxx4626)<br>SAMS -expense (xxx5633) | $148,886.81 |
| Mortgage:<br>8122 Dallas Acworth Hwy Highway, Dallas, GA | POTSOL (xxx4626)<br>BPS Solomon Expense (xxx1899)<br>SAMS (xxx9658) | $86,357.38 |
| Jaguar-Land Rover | SAMS (xxx9658)<br>BPS Solomon Expense (xxx1899)<br>POTSOL (xxx4626) | $7,961.14 |
| Southtrust | BPS (xxx2054)<br>POTSOL (xxx4626) | $307,243 |

| Capital One Credit Card-Larry Solomon | SAMS (xxx9658) | $675 |
|---|---|---|
| Prudential Insurance Accounts xxx863 and xxx662 | BPS (xxx2054)<br>BPS Solomon Expense (xxx1899)<br>SAMS (xxx9658)<br>POTSOL (xxx4626)<br>SAMS Expense (xxx5633) | $7,901.49 |
| Child Support | SAMS (xxx5633) | $6,600 |
| First Union Mortgage | BPS (xxx2054) | $4,124.76 |
| Regional Acceptance Auto Loan | SAMS (xxx5633)<br>BPS Solomon Expense (xxx1899) | $4,489.29 |
| 1102 Singleton Dr. Selma, Alabama | POTSOL (xxx4626)<br>BPS Solomon Expense (xxx1899)<br>SAMS (xxx9658) | $30,400.26 |
| 1991 Dodge Caravan<br>1994 Chevy Astro<br>Checks to "Dino's Used Cars" | BPS (xxx2054) | $2,500.00 |
| Americredit Financial Service-Auto Loan | BPS (xxx2054)<br>BPS Solomon Expense (xxx1899)<br>SAMS (xxx9658) | $8,826.95 |
| Household Credit Accounts | SAMS (xxx9658)<br>SAMS Expense (xxx1899) | $1,225.00 |
| Holy Trinity Episcopal Day School for Justin Solomon | SAMS (xxx9658) | $11,618.00 |
| State Farm Insurance | BPS (xxx2054)<br>BPS Solomon Expense (xxx1899) | $1,081.75 |

53. Approximately $355,000 in cash was withdrawn from the various accounts during the time period of June 1999 and December 2004.

_____
Sherri Queener, Special Agent, FBI

Sworn to and subscribed before me on this _____ day of May, 2005.

_____
United States Magistrate Judge