IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal No. 05-205 (RWR) |
| | : | |
| v. | : | |
| | : | VIOLATIONS: |
| | : | |
| LARRY SOLOMON, | : | 18 U.S.C. § 1347 |
| | : | (Health Care Fraud); |
| Defendant. | : | 18 U.S.C. § 1035 (a)(2) |
| | : | (False Statements Regarding |
| | : | Health Care Matters); |
| | : | 18 U.S.C. § 2 |
| | : | (Causing an Act to be Done) |

**SUPERSEDING INFORMATION**

The United States Attorney informs the Court that:

**INTRODUCTION**

1. The defendant, LARRY SOLOMON, represented himself to be a physician assistant who provided services in the District of Columbia and elsewhere.

2. BPS Medical and Rehabilitation, P.L.L.C. ("BPS Medical") was incorporated in the District of Columbia. Among other services, BPS Medical provided health care to the public through home visits to senior citizens living in private and public residential buildings throughout the District of Columbia. The defendant, LARRY SOLOMON, was a manager of BPS Medical.

3. Diversified Medical and Associates ("Diversified Medical") was incorporated in the District of Columbia. Among other things, Diversified Medical provided health care to the

-1-

public through one or more out-patient medical clinics. The defendant, LARRY SOLOMON, was a manager of Diversified Medical.

4.   BPS Medical and Diversified Medical opened a medical clinic at 544 8th Street, N.E., Washington, D.C. Later the businesses moved to other locations in the District of Columbia, including 811 8th Street, N.E. and 1647 Benning Road, N.E., as well as 10111 Martin Luther King Jr., Highway, Bowie, Maryland.

5.   The defendant, LARRY SOLOMON, conducted home visits to senior citizens living in private and public residential buildings throughout the District of Columbia.

6.   BPS Medical, Diversified Medical, and the defendant, LARRY SOLOMON, participated in the Medicaid program.

7.   BPS Medical, Diversified Medical, and the defendant, LARRY SOLOMON, participated in the Medicare program.

The Medicaid Program

8.   Medicaid was a government sponsored health insurance program for eligible low-income and needy individuals, such as children and the disabled.

9.   Medicaid was jointly financed with federal and District of Columbia funds.

10.   In the District of Columbia, the Department of Health Medical Assistance Administration (hereinafter referred to as "MAA") administered the Medicaid program.

11.   MAA contracted first with First Health and then with ACS, Inc., both fiscal agents, to receive, process, and adjudicate Medicaid claims on behalf of health care providers in the District of Columbia. Reimbursement checks were sent to health care providers by MAA.

12. Medicaid was a "health care benefit program" as defined in 18 U.S.C. Section 24(b) because it was a public plan or contract, affecting commerce, under which medical benefits, items, and services were provided to individuals.

13. Medicaid, through ACS, Inc., did not reimburse a provider for every patient visit or medical treatment. Rather, the medical service or treatment provided by the provider was required to be "reasonable and necessary" under the Medicaid program.

### The Medicare Program

14. Medicare was a government sponsored health insurance program for individuals 65 years and older, for certain disabled individuals, and for Social Security recipients. The program covered specified in-hospital and out-patient medical services, doctors' services, and certain medical supplies.

15. A senior citizen or disabled person who was eligible for Medicare could participate by enrolling in the Medicare program. Medicare typically paid about 80% of the cost of treatment by a Medicare approved physician with other insurance providers or the patient paying the other 20%.

16. The Medicare program was primarily funded through appropriations from the United States Treasury. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration (HCFA).

17. Medicare was a "health care benefit program" as defined in 18 U.S.C. Section 24(b) because it was a public plan or contract, affecting commerce under which medical benefits, items, and services were provided to individuals.

18. Medicare reimbursed health care institutions and professionals such as physicians on a "fee for service" basis through at least two different programs. First, Part A of Medicare provided reimbursement for hospital stays and similar related medical services. Second, Part B of Medicare provided payment for doctors' services, outpatient hospital services, certain home health services, medical equipment and supplies, and other related services.

19. CMS contracted with a private carrier called TrailBlazer Health Enterprises, LLC ("TrailBlazer") located in Timonium, Maryland, to administer Medicare claims for the District of Columbia. Trailblazer received, processed, adjudicated and paid claims for reimbursement submitted by Medicare Part B health care providers. In order to receive payment from Medicare, providers were required to submit claims to Trailblazer.

20. Medicare, through TrailBlazer, did not reimburse a provider for every patient visit or medical treatment. Rather, the medical service or treatment provided by the provider was required to be "reasonable and necessary" under the Medicare program.

Billing Procedures

21. On June 17, 2002, BPS Medical's Medicare application was approved by Trailblazer, and the business was given a unique group identification number. Also at that time, the defendant, LARRY SOLOMON, was provided a unique personal identification number ("UPIN") and a performing provider number.

22. Pursuant to Medicare policy, any services provided by an individual provider had to be billed under both the group number and the individual's UPIN number or performing provider number.

23. Pursuant to Medicaid policy, a claim for a physician assistant's services had to be billed to Medicaid using the provider number of the physician who supervised him or her, as well as the group number.

24. Medicare and Medicaid required that, when submitting reimbursement claims, providers identified the types of services and procedures for which they were requesting reimbursement using certain 5 digit codes, referred to as "CPT" codes. CPT codes were derived from a manual published annually by the American Medical Association known as the "Current Procedural Terminology" or "CPT" manual. The CPT manual specifically assigned a unique 5 digit CPT code to thousands of different medical treatments and procedures performed by health care providers in a variety of medical specialties.

25. Medicare and Medicaid required health care providers to use only the CPT code that truthfully and accurately reflected the actual medical treatment provided by health care providers to the patient so that Medicare or Medicaid could determine if the claim was reimbursable. CPT codes were reimbursed at different rates, depending on the service provided and the professional category of the person providing the service.

26. To obtain reimbursement from Medicare, a health care provider was required to submit claim forms to Trailblazer in either paper or electronic format. To obtain reimbursement from Medicaid, a health care provider was required to submit claim forms to ACS, Inc., in either paper or electronic format. The Medicare and Medicaid Programs required that reimbursement claims submitted by participating health care providers include, among other things, the following information: (1) the name of the beneficiary (patient); (2) the date(s) the claimed

services were provided; (3) the type(s) of services provided; and (4) the CPT code corresponding to that service.

## COUNT ONE

## (HEALTH CARE FRAUD)

27. Beginning in or about May 1999 and continuing until in or about May 2005, the defendant, LARRY SOLOMON, devised and executed a scheme and artifice to defraud the Medicare and Medicaid health benefit programs of money through submission of false claims.

### Purpose of the Scheme and Artifice

28. It was a purpose of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, would fraudulently obtain money from Medicare and Medicaid which he would use for his own benefit.

### The Scheme

29. It was part of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, submitted applications to become a Medicare provider on two separate occasions, that is, on or about March 25, 2002, and on or about May 31, 2002. Each time the defendant, LARRY SOLOMON, stated in his application that he had no adverse legal history when, in fact, defendant, LARRY SOLOMON, had been convicted of Medicaid fraud in the state of Maryland on or about October 24, 1988, for submitting claims for dates on which no services were provided and for failing to be directly supervised by a physician as required.

30. It was part of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, incorporated or caused to be incorporated, entities that were involved in transferring

money generated from BPS Medical's fraudulent billing of Medicare and Medicaid. These corporations included: Solomon Administrative and Medical Services ("SAMS"); POTSOL Management Services, Inc. ("POTSOL"); Diversified Medical and Associates; Diversified Medical Supply, S-C Properties, Katie's Fashions, and Solomon-Crozier Construction Company.

31.   It was part of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, opened numerous bank accounts in conjunction with BPS Medical, Diversified Medical, and the other businesses listed above. These accounts were established in names such as BPS Medical and Rehabilitation Clinic; BPS Medical and Rehabilitation Clinic, General ("BPS General"); BPS Medical and Rehabilitation Clinic, Solomon Expense ("Solomon Expense"); BPS Medical and Rehabilitation Clinic, DMA Expense ("DMA Expense"); POTSOL Management Services, Inc. ("POTSOL"); Solomon Administrative and Medical Services ("SAMS"); and Solomon Administrative and Medical Services, Expense ("SAMS Expense").

32.   It was part of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, performed fraudulent billing or caused others to perform fraudulent billing of Medicare and Medicaid on behalf of BPS Medical or Diversified Medical.

33.   It was part of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, did not wear a badge when visiting residents of senior buildings indicating that he was in fact a physician assistant, as required by D.C. Mun. Regs. tit. 17, §4911.8 (2001).

34.   It was a part of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, would:

- - cause claims to be submitted to Medicare and Medicaid for services on dates when neither he nor any other employee of BPS Medical had provided services;

- - cause claims to be submitted to Medicare and Medicaid using CPT Codes that applied to services that were more comprehensive and lengthy than the services actually provided;

- - cause claims to be submitted to Medicare at a physician's rate even though the defendant, LARRY SOLOMON, or another physician assistant or medical assistant actually provided the service to the beneficiary.

35.   It was part of the scheme and artifice to defraud that on or about June 11, 2004, the defendant, LARRY SOLOMON, contracted to pay $36,000 to be paid in monthly installments of $3,000, to another person who had been a manager at BPS Medical for the right to submit claims to Medicare and Medicaid on behalf of patients in senior buildings.

36.   It was part of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, would use revenues generated from Medicare and Medicaid reimbursements made to BPS Medical to fund other business ventures, including clothing and computer stores and a food warehouse.

37.   It was part of the scheme and artifice to defraud that the defendant, LARRY SOLOMON, would use revenues generated from Medicare and Medicaid reimbursements to purchase automobiles, clothing, and insurance policies; to make credit card and child support payments; and to pay property taxes and mortgage payments on a house in Glenn Dale, Md.

38. Between in or about February 2001 until in or about May 2005, in the District of Columbia and elsewhere, the defendant LARRY SOLOMON, knowingly and willfully devised and executed a scheme and artifice to defraud health care benefit programs, namely Medicare and Medicaid, and to obtain from Medicare and Medicaid, money under the custody and control of Medicare and Medicaid, by fraudulent pretenses, representations, and promises, namely, false claims, in connection with the delivery of, and payment for, health care benefits, items, and services.

**(Health Care Fraud, and Causing an Act to be Done,**
**in violation of Title 18, United States Code, Sections 1347 and 2)**

## COUNT TWO

### (FALSE STATEMENTS RELATING TO HEALTH CARE MATTERS)

1. Paragraphs 1 through 26 of Count 1 are realleged and incorporated as though fully set forth herein.

2. On or about May 31, 2002, the defendant, LARRY SOLOMON, in a matter involving a health care benefit program, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations and made and used materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries in connection with the delivery of and payment for health care benefits, items, and services, to wit the defendant, LARRY SOLOMON, submitted an application to become a

Medicare provider in which the defendant, LARRY SOLOMON, stated that he had no adverse legal history when, in fact, defendant, LARRY SOLOMON, had been convicted of Medicaid fraud in the state of Maryland on or about October 24, 1988, for submitting claims for dates on which no services were provided and for failing to be directly supervised by a physician as required.

**(False Statements Regarding Health Care Matters, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1035 (a)(2) and 2)**

                        Respectfully submitted,

                        KENNETH L. WAINSTEIN
                        United States Attorney

By:   _____
       KIM HERD
       D.C. BAR No. 461615

       _____
       THOMAS E. ZENO
       D.C. Bar No. 348623
       Assistant United States Attorneys
       555 Fourth Street, NW, Room 5423
       Washington, D.C. 20530
       (202) 514-6957