IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Criminal No.  05-205 (RWR) |
| | : | |
| v. | : | |
| | : | |
| **LARRY SOLOMON,** | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

### SUMMARY

Although he billed Medicare for allegedly conducting detailed medical examinations of senior citizens, defendant actually performed only minimal medical examinations in which he checked the pulse rate and blood pressure of the seniors.  Defendant also failed to keep medical records of what procedures he did perform.  Because he is a recidivist who caused more than $305,000 in loss to the Medicare program through his false billing in this case, defendant should be sentenced to 13 months imprisonment.

### ARGUMENT

Defendant's false application attempted to hide his prior false billing.

In the application he submitted to Medicare in May 2002 seeking permission to bill Medicare through the company BPS Medical & Rehabilitation Clinic PLLC (BPS Medical), defendant falsely stated that he had no adverse legal history.  In fact, defendant had been

convicted in 1988 in Maryland for Medicaid fraud. The factual statement from that conviction, which was signed by the defendant, is attached to this pleading. In that statement, defendant admitted that he was "responsible for submitting Medicaid billings." Defendant also admitted that some of the billings "reflected additional services which had not, in fact, been performed." For instance, defendant "submitted fifteen (15) billings for medical services on various Sundays. . . . [Defendant] also submitted billings for holidays such as Christmas and Easter." Defendant also admitted that he acted as a physician's assistant without having the direct supervision of a physician which is required by Medicaid regulations.

As a result of the 1988 conviction, defendant was excluded from the Medicaid and Medicare programs. Because disclosure of his conviction could have caused the BPS Medical application to be denied, defendant decided to lie his way back into the program rather than try to gain readmission honestly. After helping to establish BPS Medical, defendant submitted thousands of false claims through BPS Medical regarding the services he was providing just to Medicare recipients, not to mention Medicaid recipients and those with private insurance. Although defendant's false statement in the application for BPS Medical makes it possible to argue that every claim which defendant submitted through the company should be included in the amount of loss he caused, the government used a more targeted analysis.

<u>Defendant upcoded claims to Medicare.</u>

The government will accept as a measure of loss the amount of money Medicare overpaid BPS Medical because of defendant's upcoded claims. The term "upcoding" relates to the fact that the amount of a Medicare payment depends upon the Current Procedure Terminology code (CPT code) listed on the claim. In this case, the overwhelming majority of defendants' claims

were for CPT code 99349. The American Medical Association describes the requirements of CPT code 99349 as:

> **Home Visit** for the evaluation and management of an established patient, which requires at least two of these three key components:
>
> - **a detailed interval history**
> - **a detailed examination**
> - **Medical decision making of moderate complexity.**
>
> Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.
>
> Usually, the presenting problem(s) are moderate to high severity. Physicians typically spend 40 minutes face-to-face with the patient and/or family.

In fact, when defendant saw a Medicare recipient, he usually just checked the patient's pulse and blood pressure – the kind of service available at no cost through use of an automated machine in many pharmacies.

There are well more than 100 days on which the defendant's billing pattern demonstrates, in and of itself, that he upcoded whatever services he did provide. Here are two examples:

March 16, 2005

Defendant claimed to have provided services to 41 people at a senior building on March 16, 2005. If each visit really had lasted for the typical "40 minutes face-to-face" time described for CPT code 99349, it would have taken defendant more than 27 hours to see all the people that day. Even the time required to see only the 35 people for whom Medicare was billed would have required the defendant to work more than 23 hours that day. Obviously, defendant did not provide a service level of CPT code 99349.

July 9, 2004

Defendant claimed to have provided services to 30 people at a senior building on July 9, 2004. If each visit really had lasted for the typical "40 minutes face-to-face" time described for CPT code 99349, it would have taken defendant more than 20 hours to see all the patients that day. However, the sign-in sheet at the building for that day shows that defendant stayed for just one hour and fifteen minutes. Even the time required to see only the 16 people for whom Medicare was billed would have required the defendant to fit more than 10 hours of work into an hour and a quarter. Again, it is obvious that defendant did not provide a service level of CPT code 99349.

Defendant sometimes upcoded in a second manner by submitting the claim under the billing number of a medical doctor rather than his number as a physician's assistant. This form of upcoding created a loss for the government because Medicare pays more for a service performed by a medical doctor than it does for the same service performed by a physician's assistant. Although he could have billed under a medical doctor's number if defendant had been under the direct supervision of a medical doctor, defendant worked without such supervision. As a variant of this type of upcoding, defendant also claimed to have provided a service when the work actually had been performed by a medical assistant. Because Medicare will not pay for a home visit provided by a medical assistant, this practice caused additional loss to the government.

How the amount of loss was calculated.

In order to calculate the amount of loss attributable to defendant's upcoding, FBI Special Agent Sherri Queener assumed that defendant provided service by a physician assistant at the

level of CPT code 99347. This is a generous assumption in defendant's favor because the investigation revealed that the level of service provided by defendant (i.e., taking blood pressure and pulse) may not even have reached the level of CPT code 99347, which the American Medical Association describes as:

> **Home Visit** for the evaluation and management of an established patient, which requires at least two of these three key components:
>
> • **a problem focused interval history**
> • **a problem focused examination**
> • **straightforward medical decision making.**
>
> Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.
>
> Usually, the presenting problem(s) are self limited or minor. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

This calculation also is favorable to the defendant because it assumes that defendant actually provided some kind of service for every bill he submitted to Medicare even though evidence revealed that defendant was billing for people he had not visited.[1]

Working with other agents, Agent Queener assembled all the rosters for BPS Medical which had been seized during execution of search warrants. A roster was an internal form of BPS Medical consisting of a preprinted list of senior citizens residing at a particular apartment building. A roster could be annotated to identify the date on which services were provided as well as to indicate the individuals who received services. A roster also could be annotated to

---

[1] People complained about this practice when they received copies of the claims submitted by BPS Medical to Medicare on their behalf. Medicare notices to defendant of such complaints were among records seized during execution of search warrants.

identify the person who provided the services. The information contained on a roster was used by BPS Medical to submit claims to Medicare, Medicaid and private insurance companies. As explained below, by comparing rosters to the Medicare billing data, Agent Queener determined the amount of loss to be more than $307,000 for the period of January 1, 2003 through May 12, 2005. The actual amount of loss could be higher for various reasons such as the fact that losses to Medicaid were not counted.

It might have been more precise to rely upon medical files, rather than rosters, in order to determine the services which defendant provided during home visits. However, the deplorable state of the medical records relating to defendant's home visits prevented that kind of analysis. A typical medical file for an individual seen by defendant for a home visit was woefully out of date and contained virtually no information – such as progress notes or examination forms-- to support the bills submitted by defendant. A few examination forms completed by defendant were discovered scattered throughout BPS Medical's office, defendant's home, and defendant's car. However, they were totally separate from the medical files and too few of them were found to be a useful comparison to the thousands of claims submitted by defendant.[2] Even though the rosters themselves were found in a disorganized array, once they were collected and organized by the agents, the rosters provided a way of determining the claims submitted by defendant.

---

[2] Despite performing minimal medical examinations, defendant nonetheless wrote prescriptions for medications. It is particularly disturbing that defendant did not ensure these prescriptions were included in the medical files as a record of treatment for each person. Instead, defendant left the prescriptions scattered about his house and car.

Loss in 2003

For the year 2003, Agent Queener identified all the rosters annotated to identify defendant as the provider of service. Because defendant was not the only person who billed under BPS Medical, this culling process ensured that information would be limited only to rosters showing that defendant had provided services. Agent Queener then compared those rosters to the claims data, which had been assembled in an electronic format by Medicare from the claims submitted by BPS Medical. Among other things, the claims data contained the name of the recipient, the date of service, the type of service, the UPIN (unique personal identification number) of the provider of the service, and the amount paid. The claims data revealed that BPS Medical was paid $177,677.06 for 1,717 claims which were on rosters annotated to list defendant as the provider of service. All the claims were billed as CPT code 99349 or higher. If the claims had been paid at the applicable rates for a physician assistant providing CPT code 99347,[3] BPS would have been paid only $61,288.82. The overpayment thus exceeded $116,000 that year.

Loss in 2004

The loss amount for 2004 was calculated in a similar fashion. As for year 2003, the claims data revealed that BPS Medical was paid $218,151.05 for 2,224 claims which were on rosters annotated to identify defendant as the provider of services. All but four claims were billed as CPT code 99349 or higher. If the claims had been paid at the applicable rate for a physician assistant providing CPT code 99347, BPS Medical would have been paid only $72,813.76. The overpayment thus exceeded $145,000 that year.

---

[3] Medicare's payment schedule changed during 2003.

In addition, Agent Queener found 265 claims on rosters for which there was no name listed as the provider of services. However, it was clear that defendant was the provider of service because the recipients of these 265 claims were also on other rosters which had been annotated to identify defendant as the provider of service.[4] The claims overwhelmingly were billed as CPT code 99349. If the claims had been paid at the applicable rate for a physician assistant providing CPT code 99347, BPS Medical would have been paid only $8,676.10. The overpayment thus increased by more than an additional $17,000.

Further, Agent Queener found that BPS Medical had billed 147 claims annotated to identify the medical assistant as the provider of services. BPS Medical billed these claims as if a physician assistant had provided a service of CPT code 99349, even though only a medical assistant had provided the service. None of these claims was valid because Medicare would not pay for services provided by a medical assistant. The overpayment thus increased by more than an additional $11,000.

Loss in 2005

The loss amount for the period January to May 2005[5] was calculated in the same fashion as the loss for 2003. The claims data revealed that BPS Medical was paid $25,714.15 for 269 claims which were on rosters annotated to identify defendant as the provider of services. All the claims were billed as CPT code 99349 or higher. If the claims had been paid at the applicable

---

[4] These 265 claims come from rosters on which there was no name at all. A comparison between a roster and the billing data could be made for a roster annotated with defendant's name, even if the second page of the roster could not be located.

[5] The search warrants were executed in May 2005.

rate for a physician assistant providing CPT code 99347, BPS Medical would have been paid only $9,132.55. The overpayment thus exceeded $16,000 that year.

Total loss

Defendant caused a loss in excess of $305,000 which consisted of payments made by Medicare for upcoded claims of more than $116,000 for 2003, of more than $145,000 for 2004, and of more than $16,000 for 2005. In addition, the loss consisted of more than $17,000 paid by Medicare for 265 claims in 2004 for recipients otherwise listed on rosters as receiving services from defendant. Finally, the loss consisted of more than $11,000 paid by Medicare for claims in 2004 for services provided only by a medical assistant.

### Defendant's false billing is relevant conduct to defendant's false statement.

"In order to sentence a defendant under the Guidelines, the district court must determine the 'relevant conduct' for which that defendant is responsible." United States v. Mellen, 393 F.3d 175, 182 (D.C. Cir. 2004). "Relevant conduct" includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection for that offense." U.S.S.G. § 1B1.3(a)(1)(A). For offenses that would otherwise be grouped as multiple counts under Guidelines § 3D1.2(d) -- such as the false statement offense to which defendant pleaded guilty -- relevant conduct includes all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." The Guidelines further provide that, "[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common

9

accomplices, common purpose, or similar modus operandi." Guidelines § 1B1.3, Application Note 9(A). The government has the burden of proving relevant conduct at sentencing, but need do so only by a preponderance of the evidence. Pinnick, 47 F.3d 434, 437 (D.C. Cir. 1995). A district court's "relevant conduct" determination is reviewed for clear error. United States v. Seiler, 348 F.3d 265, 268 (D.C. Cir. 2003); United States v. Leonzo, 50 F.3d 1086, 1088 (D.C. Cir. 1995) (loss calculation); United States v. Pinnick, 47 F.3d at 437 (relevant conduct). Cf. Mellen, 393 F.3d at 183 (due deference standard applies when "relevant conduct" issue involves application of the Guidelines to the facts).

   Defendant's false statement was so intimately connected to the creation and operation of BPS Medical that the false statement was part of the 2002 application for BPS Medical to be approved as a Medicare provider. In fact, the only reason defendant needed to make a false statement on the application was because he wanted BPS Medical to be able to submit bills to Medicare and Medicaid. If defendant had not lied on the application for BPS Medical to become an approved Medicare provider, he would not have been able to submit claims through BPS Medical. The false statement and the false claims were part of a common scheme or plan as required by the Guidelines because the falsehoods were directed at a common victim, Medicare, with the common purpose of obtaining money, by the common method of billing through the company, BPS Medical.

   Further, defendant knew the import of the CPT codes he was using. Defendant gained experience with medical billing at least as long ago as the time he falsified Medicaid claims in 1988 in Maryland. At BPS Medical, defendant was the Vice President of Administration. He identified himself to Medicare in 2002 as the primary contact at BPS Medical for electronic

billing. He also signed the electronic billing agreement which, among other things, guaranteed that BPS Medical would "submit claims that are accurate, complete, and truthful;" that BPS Medical would retain a "source document" for every claim which would reflect the service performed and which could be audited; and that signing a claim with the UPIN "constitutes an assurance by the provider that services were performed as billed."[6]

## CONCLUSION

Because of his prior conviction for false medical billing, defendant's conduct in this case displayed a high level of willfulness. He billed for detailed and lengthy medical services while merely providing cursory ones. He kept virtually no medical records for the people he alleged to have treated. Defendant billed falsely and made at least $305,000 through his false billing. He should be sentenced to 13 months incarceration.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
D.C. Bar # 451058

_____

Thomas E. Zeno
Assistant United States Attorney
D.C. Bar No. 348623
United States Attorney's Office
555 4th Street, N.W., Room 5243
Washington, D.C. 20530
(202) 514-6957

---

[6] Aspects of defendant's objections to the PSR imply that he might not have known that CPT code 99349 was being used. If the defendant actually takes that position, the government will request permission from the Court to provide contrary evidence from grand jury testimony of employees at BPS.

## CERTIFICATE OF SERVICE

    I HEREBY certify that a copy of the foregoing Sentencing Memorandum was served via electronic filing on this 16th day of June 2006 to:

Mary Petras, Esquire
Assistant Federal Public Defender
Suite 555
625 Indiana Avenue, N.W.
Washington, D.C. 20004

_____
THOMAS E. ZENO
Assistant United States Attorney