UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :     Cr. No. 05-205 (RWR) |
| v. | |
| | : |
| LARRY SOLOMON | : |

DEFENDANT'S OBJECTIONS TO PRESENTENCE
INVESTIGATION REPORT AND MEMORANDUM IN AID OF SENTENCING

     On February 17, 2006, Mr. Larry Solomon, the defendant, entered a plea of guilty to one count of making a false statement relating to a health care matter, in violation of 18 U.S.C. § 1035. He will appear before this Honorable Court for sentencing on June 30, 2006. At that time, the government will seek to have the Court give Mr. Solomon a sentence based not on the conduct that led to his conviction here, but on allegations of a large-scale Medicaid/Medicare fraud – allegations to which Mr. Solomon did not plead guilty, allegations which he strongly denies, and allegations which have not been presented to a jury or proven. If the government had chosen to proceed with these allegations, Mr. Solomon would have insisted on a trial with all the rights guaranteed him to demonstrate that he is not guilty of these broader allegations. However, the government chose not to go forward with these charges and instead agreed to dismiss these charges, if Mr. Solomon pled guilty to the offense he committed – making a false statement in a Medicare provider application. Mr. Solomon respectfully requests that the Court sentence him only for the conduct for which he is before the Court for sentencing and not hold a mini-trial to determine the accuracy of charges that the government has chosen to dismiss. Such a mini-trial would not provide Mr. Solomon with the necessary opportunity to fully confront all government

witnesses and contest the charges. In support of his sentencing requests, Mr. Solomon submits the following objections to the Presentence Investigation Report and additional information for the Court's consideration in determining a reasonable and appropriate sentence.

Factual Background

Mr. Solomon is a fifty-two-year-old Physician Assistant and father of five. He lives in Glenn Dale, Maryland with his wife and two youngest children, twelve-year-old Justin, and nine-year-old Joshua. As the letters submitted under separate cover attest, Mr. Solomon is a good father, neighbor and friend, who works hard to help is family, friends and patients.

Mr. Solomon grew up in rural Stafford, Alabama, where he lived with his parents and four siblings on a farm. He worked on the farm and in his parents' grocery store every day, before and after school. After graduating from Keith High School in 1971, he attended Tuskegee University, where he graduated with a Bachelor of Science degree in biology. During his college years, Mr. Solomon worked at a Ford Motor plant in Detroit, Michigan during the summers. He also married his first wife in 1972.

In 1976, after graduating from Tuskegee, Mr. Solomon enlisted in the United States Army. He served for two years and was trained as a medical surgical technician. After his discharge in 1978, Mr. Solomon entered the Physician Assistant Certificate Program at Howard University. He graduated and became a licensed Physician Assistant in 1980.

Mr. Solomon then began working with a doctor in Selma, Alabama. He stayed in Alabama for two years, but returned to the District of Columbia Area in 1982, where he continued to work as a Physician Assistant. In the following years, he worked at a John Hopkins clinic, the Baltimore City jail and the D.C. Department of Corrections. In 1987, Mr. Solomon

and a doctor with whom he had worked in the D.C. Department of Corrections went to Cambridge, Maryland to continue the medical practice of another doctor. During this time period, Mr. Solomon was charged with and pled guilty to one count of Medicaid Fraud before the Circuit Court for Baltimore City. He was placed on a five year period of probation and ordered to pay restitution. Mr. Solomon paid the restitution and successfully completed the probation in 1993.

Although he pled guilty in that matter, Mr. Solomon retained his license to practice as a Physician Assistant in the District of Columbia and, in 1988, he resumed working with the D.C. Department of Corrections. In 1992, he founded a company to provide medical services and personnel to correctional facilities in Pennsylvania, Maryland and the District of Columbia.

During this time period, Mr. Solomon and his first wife divorced. Together, they had three children, Broderick, who is now 32 years old, Felicia, who is now 29 years old, and Kenyatta, who is now 26 years old. After the divorce, Mr. Solomon maintained a close relationship with his children and continued to support them financially, helping to put them through college. Mr. Solomon remarried in 1993, and has two young sons with his second wife.

In 1996 and 1997, when the District of Columbia experienced financial difficulties and was unable to make payments on invoices, Mr. Solomon and his company filed for bankruptcy. In 1998, Mr. Solomon began working through a contractor as a Physician Assistant at Greater Southeast Community Hospital. In 1999, Dr. Keith Banton, a doctor with whom Mr. Solomon worked at Greater Southeast, asked Mr. Solomon and another doctor, Dr. Charles Potts, to help reopen a clinic that Dr. Banton and his former partner had previously closed. Dr. Banton, Dr. Potts and Mr. Solomon formed a company and opened the clinic in Northeast.

Dr. Banton left the practice a short time later, but Mr. Solomon continued to practice with Dr. Potts. Over the years, Mr. Solomon and Dr. Potts had many financial disputes, but Mr. Solomon continued to rely on practices established by Dr. Potts with regard to billing policies.

In 2002, Dr. Potts asked Mr. Solomon to apply with him for a Medicare identification number. Dr. Potts told Mr. Solomon – and others – that he (Dr. Potts) was having tax problems and did not want all of the Medicare billing to go through his name. Mr. Solomon did as Dr. Potts asked and prepared the application for BPS Medical and Rehabilitation. In the application, Mr. Solomon stated that he had "no adverse legal history." That statement was false because Mr. Solomon had the 1988 conviction for Medicaid fraud in Maryland. As a result of the application, TrailBlazer Health Enterprises, LLC[1] issued a Medicare group number to BPS (G00846), and two Medicare rendering identification numbers – one to Dr. Charles E. Potts (00B120B46) and one for Mr. Solomon (00B121B46). Thereafter, at Dr. Potts's direction, the billing that was previously submitted under Dr. Potts's rendering numbers was submitted under these numbers.

In May, 2005, Mr. Solomon was arrested in this matter and charged with health care fraud. As noted above and discussed more fully below, Mr. Solomon strongly denies the broad allegations set forth in the indictment. He recognizes, as the government notes in its sentencing memorandum, that he was not a good recorded-keeper and that the billing was not done properly. Mr. Solomon, however, did not create a fraudulent billing system nor did he purposefully, willfully, or knowingly commit the fraudulent scheme the government has alleged.

---

[1] TrailBlazer Health Enterprises, LLC is a contracted intermediary and carrier for the Centers for Medicare & Medicaid Services.

Following his arrest, Mr. Solomon and his family were devastated. The stress of his arrest and the pending charges was overwhelming for him and his extended family. Mr. Solomon did not work for several months after his arrest and focused on caring for his family.

Several months after his arrest, the doctors that took over the medical practice at the clinic asked Mr. Solomon to come back to work to help with the continuity of patient care. Mr. Solomon helped for several months without compensation and is now working as a Physician Assistant for Dr. Jean Linzau. As the Presentence Investigation Report notes, this practice is located at the same clinic where Mr. Solomon worked with Dr. Potts. However, Dr. Linzau and Mr. Solomon do not conduct home visits, which were the subject of the government's allegations of prior false billing and Mr. Solomon is not involved in the billing process. Moreover, the government has not alleged that fraudulent billing was ever submitted based on the care provided at the clinic.

Argument

Generally, the government has made two claims against Mr. Solomon: (1) that he made a false statement in a Medicare application; and (2) that he engaged in a fraudulent billing scheme. Mr. Solomon has admitted and pled guilty to the first allegation – he made a false statement. That is the offense for which he will be sentenced. Mr. Solomon did not engage in a fraudulent billing scheme – that is, he did not willfully and knowingly devise a scheme to defraud. If there were billing errors, they were either not done intentionally or not done by Mr. Solomon. With regard to billing practices, Mr. Solomon relied on practices established by his supervising physician, Dr. Potts. Because he did not plead guilty to a scheme to defraud and any such scheme is not relevant conduct, there is no loss amount that should be used in calculating the

applicable range under the United States Sentencing Guidelines ("Guidelines").  In the Government's Memorandum in Aid of Sentencing, the government argues that the amount of the loss attributable to Mr. Solomon includes more than $305,000 of what the government claims was billing fraud.  Essentially, the government asks the Court to sentence Mr. Solomon for an offense that he did not plead guilty to, that he has not been found guilty of, and that is not supported by the record.  Such a sentence would be unreasonable.  See United States v. Booker, 543 U.S. 220 (2005).  Regardless of the applicable Guideline range, when all of the sentencing factors set forth in 18 U.S.C. § 3553 are considered, a sentence of incarceration would not be appropriate or reasonable.

I.     THE PRESENTENCE INVESTIGATION REPORT INCORRECTLY CALCULATES THE APPLICABLE SENTENCING RANGE BY INCREASING THE OFFENSE LEVEL BASED ON A FINANCIAL LOSS.

In Presentence Investigation Report ("PSI"), the United States Probation Office takes the position that the amount of the loss attributable to the offense of conviction includes the total amount of all of the claims submitted under the billing number that Mr. Solomon obtained as a result of his false statement, that is $67,428.64.  As set forth in greater detail below, this finding is erroneous because:  (A)  there was no loss from the offense of conviction because there is no evidence that Mr. Solomon would not have received this billing number had he not made the false statement at issue and because the billing at issue was occurring regardless of the billing number given to Mr. Solomon; (B) the billing at issue was not the result of fraudulent conduct by Mr. Solomon; and (C) even under the government's theory a portion of the $67,428.64 total billing under the number given to Mr. Solomon was legitimate, and the loss can be no greater than the portion of the claims that allegedly was over-billing, or no more than $30,000.

6

A.    <u>There Was No Actual or Intended Loss from the Offense</u>.

In determining the applicable offense level and guideline range, the Court must consider all relevant conduct. See U.S.S.G. § 1B1.3. Relevant conduct includes acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction," but does not include unproven conduct or conduct that is not part of the same course of conduct or common scheme or plan. The government's allegations are neither proven, nor part of the same course of conduct or a common scheme or plan. The Court need not address the government's arguments that fraud occurred and that Mr. Solomon was responsible for it because the offense level can be increased only if there was a financial loss as a result of the offense at issue. As the PSI notes, the applicable guideline for the offense to which Mr. Solomon pled guilty is § 2B1.1, and the base offense level is 6. This offense level can be increased if a financial loss "resulted from the offense" or was "intended to result from the offense." See U.S.S.G. § 2B1.1, Application Note 3(A)(I) and (ii). Here, no loss resulted from the offense or was intended to result from the offense.

As set forth in the information, Mr. Solomon's false statement consisted of his statement that he did not have a prior conviction for Medicaid fraud. This statement was made in the application for BPS Medical and Rehabilitation to become an authorized Medicare provider. Based on this application, TrailBlazer Health Enterprises, LLC[2] issued a Medicare group number (G00846), and two Medicare rendering identification numbers – one to Dr. Charles E. Potts (00B120B46) and one for BPS (00B121B46).

---

[2]TrailBlazer Health Enterprises, LLC is a contracted intermediary and carrier for the Centers for Medicare & Medicaid Services.

Mr. Solomon is a licensed Physician Assistant, and Dr. Potts is a physician. Mr. Solomon and Dr. Potts provided legitimate healthcare services. They began by providing services at a clinic in Northeast and later, at the direction of Dr. Potts, began providing services to elderly patients in their homes. Dr. Potts initially began the home service portion of their practice and established the billing practices for these services. Dr. Potts later recruited Mr. Solomon to help provide these services.

The Medicare application at issue was filed as part of their legitimate medical practice. Putting aside the fact that whether or not fraudulent claims were subsequently submitted (and, if so, who was responsible for them) are disputed issues, there is no evidence that the application was filed as part of a pre-arranged plan to submit fraudulent claims, rather than an act done in the normal course of establishing a medical practice. In other words, the application was not part of any scheme to defraud. Because the application was not part of a scheme to defraud, no loss resulted from the offense, and even if there was such fraud, that fraud cannot be considered relevant conduct when determining the applicable guideline range for the offense of conviction.

Under the Guidelines, the alleged fraud can be considered relevant conduct only if it was part of the same course of conduct or common scheme or plan. See U.S.S.G. § 1B1.3. "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purposes, or similar modus operandi. . . . Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, Application

Note 9.  Neither of these definitions apply here.  Conduct is not part of the same course of conduct if the offense of conviction and the offense offered as relevant conduct can be separately identified and are of different natures.  See United States v. Jones, 948 F.2d 732, 737-38 (D.C. Cir. 1991).  Additionally, "[w]hen the offense involves making a false statement, the inquiry to determine loss must focus on the amount of loss related to the false statement."  See United States v. Wilson, 980 F.2d 259, 262 (4th Cir. 1992).  Losses that would have occurred even if the false statement had not been made should not be included.  See Id.; see also United States v. Copus, 110 F.3d 1529 (10th Cir. 1997).

Here, the false statement on the application was not part of any fraudulent scheme, nor was it a necessary prerequisite to any such scheme.  Any fraudulent conduct is not relevant conduct and any losses that occurred as a result of any fraudulent conduct cannot be attributed to the false statement.  Although Mr. Solomon made a false statement regarding his prior record, as the government apparently recognizes, the fact of Mr. Solomon's prior conviction did not make him permanently ineligible to be a provider and did not mean his application necessarily would have been denied.  See Government's Memorandum in Aid of Sentencing at 2 ("Because disclosure of his conviction *could have* caused the BPS Medical application to be denied, . . ." (emphasis added)).  More importantly, Mr. Solomon's conviction did not disqualify Dr. Potts from being a provider and obtaining a rendering number.  Even if Mr. Solomon had disclosed his prior conviction, Dr. Potts would have been provided with his rendering number and it is also likely that Mr. Solomon also would have been provided with a rendering number.  Thus, even if fraud subsequently occurred – a claim that we dispute – no loss resulted from the offense at issue, that is Mr. Solomon's false statement regarding his prior record.

That any alleged fraud was not the result of the offense of conviction is demonstrated by the fact that the billing practices about which the government complains began at the direction of Dr. Potts before the application at issue was submitted. The home visits at issue and the billing practices associated with them were established by Dr. Potts and in place before the application was filed and before Mr. Solomon began conducting home visits. Dr. Potts began the practice of conducting home visits and established the practice of using the CPT code referred to by the government before Mr. Solomon ever made home visits. The application at issue here was filed at Dr. Potts's direction only because of Dr. Potts's concerns related to his own problems with the Internal Revenue Service. Mr. Solomon made the false statement on the application not because of any intent to enter into any fraudulent scheme, but because of his own embarrassment over his past record.

B.  Mr. Solomon Did Not Knowingly and Willfully Devise or Participate in a Fraudulent Scheme.

In order to support an increase in Mr. Solomon's offense level based on financial loss, the government must first prove by a preponderance of the evidence that there was a fraudulent scheme and that Mr. Solomon knowingly, willfully and intentionally engaged in the a scheme. United States v. Pinnick, 47 F.3d 434, 437 (D.C. Cir. 1995); see also United States v. Salmon, 948 F.2d 776, 779 (D.C. Cir. 1991) ("conduct is only relevant if the defendant is accountable for it"). The loss the government refers to is related to billing practices. Mr. Solomon has consistently maintained that he was not responsible for the billing practices of Dr. Potts, his supervising physician, or anyone else and that he is not criminally responsible for any billing errors. Mr. Solomon's guideline range cannot be increased based on the government's

allegations, absent proof that criminal fraudulent billing occurred and that Mr. Solomon was criminally responsible for it. Over-billing that occurred as a result of the conduct of others or even Mr. Solomon's negligent behavior cannot be considered criminal conduct for which he is responsible – the government must prove that Mr. Solomon willfully devised a scheme to defraud. See, e.g., United States v. Hickman, 331 F.3d 439 (5th Cir. 2003).

The government's allegations are complex and a fair and full trial on these charges would have taken weeks, as the parties had estimated. Mr. Solomon was prepared to fight these allegations and exercise his right to a trial. However, the government chose to dismiss the charges if Mr. Solomon pled guilty to the offense he actually committed – making a false statement on the application. In an effort to have Mr. Solomon sentenced based on conduct for which he has not been convicted, the government now submits to the Court a biased summary of the allegations and plans to put its allegations before the Court by way of the hearsay testimony of a government agent at the sentencing hearing. The Court should not now permit the government to obtain a sentence based on allegations that have not been proven before a jury.

Although it is not possible to adequately air these complex issues through sentencing memorandums, Mr. Solomon does submit that there are numerous inaccuracies in the government's allegations. The government alleges a widespread scheme of intentional fraud based on allegations that Mr. Solomon billed Medicare for services not provided and/or over-billed for services provided. The government's allegations rely in large part on allegations made by Dr. Potts who, because of his position as the supervising physician, has a strong motive to place any blame for inaccurate billing on Mr. Solomon. Although the government has provided statements from some individuals claiming that they were billed when Mr. Solomon merely took

their blood pressure, Mr. Solomon's treatment involved more than merely taking blood pressure and included, among other services, checking a patient's heart, lungs, abdomen, extremities for swelling, diabetes checks, monitoring acute and chronic illnesses, and maintaining medical supplies. While some patients required only short visits, as the government acknowledges, others patients interviewed by government agents confirm that their visits with Mr. Solomon lasted 30 minutes and Mr. Solomon performed the services for which he billed. It was Dr. Potts, not Mr. Solomon, who began the home services portion of the practice. Dr. Potts established the billing practices used, including the choice of the "CPT" code. Mr. Solomon relied on Dr. Potts's determination of the appropriate code. Moreover, the practice of billing through the supervising physician is a practice commonly used by Physician Assistants, and because this was the common practice Mr. Solomon relied on the practices followed by Dr. Potts. The government gives examples of two days for which the bills submitted by BPS would have required Mr. Solomon to work 20 or more hours in a day. While these bills clearly were erroneous, the government has not demonstrated that the errors were the result of fraud and not mere negligence – or even gross negligence – nor has the government demonstrated that Mr. Solomon was the source of the errors. For some of the bills, the only error may have been the date of service on the bills.[3]

      C.      Even If a Loss Amount Was Attributable to the Offense That Loss Amount Can Be No More than $30,000.

The government claims that there was a loss in excess of $305,000.00. As the Probation

---

[3] The government also complains of the disorganized manner in which Mr. Solomon kept his records. See Government's Memorandum in Aid of Sentencing at 6. While such disorganization may have been negligent and may have led to billing errors, this was negligence, not fraud.

Office has found this claim is not supported by the evidence. The government obtained this alleged loss amount by beginning with all of the claims submitted by BPS Medical to Medicare under both the rendering number issued to Dr. Potts (00B120B46) and the number issued to BPS (00B121B46). The government eliminated the claims that they could not allege were associated with Mr. Solomon, and then determined the dollar amount that Medicare paid for the remaining claims. The government then determined the difference between the amount paid on these claims and the amount that would have been paid by Medicare on these claims if they were charged at the rate for a Physician Assistant performing the most minimal tasks for home visits.

Assuming arguendo that any loss amount resulted from Mr. Solomon's false statement, the government's loss number greatly over estimates the value of any loss to Medicare that can be attributed to Mr. Solomon's false statement. First, the only loss that could possibly be attributed to Mr. Solomon's false statement in his Medicare application is the value of the claims submitted under the rendering number he obtained as a result of the application. Most of the claims the government includes within its calculation were submitted under the rendering number issued to Dr. Potts (00B120B46). These claims would have been paid even if Mr. Solomon had not made the false statement regarding his prior conviction. Dr. Potts was entitled to obtain his rendering number, independent of Mr. Solomon, and submitted billing similar to that at issue here before the application at issue was filed.[4] Claims filed under the number given to Dr. Potts, therefore, are not related to the charged offense and cannot be included in the loss

---

[4] As noted above, Dr. Potts began providing home services before Mr. Solomon, and Dr. Potts established the billing policies.

amount. See, e.g., United States v. Haddock, 12 F.3d 950, 963 (fees that would have been paid even if the false statement had not occurred could not be included in loss amount).

The total value of all of the claims submitted under the number issued to BPS as a result of the application (00B121B46) is $67,428.64. This is the loss amount adopted by the Probation Office. While the Probation Office is correct in limiting the loss amount to not more than the amount of claims submitted under the rendering number obtained as a result of the application, if this is the basis for the loss amount, it must be reduced by the number of legitimate claims, as the government has reduced its proposed loss amount. See Government's Memorandum in Aid of Sentencing at 2 ("The government will accept as a measure of loss the amount of money Medicare *overpaid* BPS Medical because of defendant's upcoded claims." (emphasis added)). Mr. Solomon respectfully submits that portion of the claims that the government does not allege is fraudulent is subtracted and the claims are limited to those for which Mr. Solomon (as opposed to anther Physician Assistant or Dr. Potts) provided services, the loss value would not exceed $30,000.

Both the government's loss amount and the Probation Office's loss amount also greatly over estimate the value of any loss to Medicare because these values presume that Mr. Solomon never performed more than the minimal requirements and that Mr. Solomon was responsible for the billing for patients seen by other Physician Assistants and/or Dr. Potts. Mr. Solomon was not responsible for the billing in relation to these patients and the government has not provided proof that Mr. Solomon was responsible. The government has not even demonstrated that any over-billing was the result of more than negligence. Therefore, Mr. Solomon's offense level cannot be increased based on any loss amount.

II.     A SENTENCE OF INCARCERATION WOULD NOT BE APPROPRIATE.

Regardless of which Guidelines calculation the Court adopts, a sentence of incarceration is not appropriate. In determining a reasonable sentence, the Court must consider the United States Sentencing Guidelines (hereinafter "Guidelines"), along with the other factors set forth in 18 U.S.C. § 3553(a). Booker, 543 U.S. at 260. These factors include: "The nature and circumstances of the offense and the history and characteristics of the defendant; . . . the kinds of sentences available; . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and . . . the need to provide restitution to any victims of the offense." 18 U.S.C. 3553(a). After considering all of the factors set forth in § 3553(a), the Court must impose a sentence "that reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence, protect[s] the public, and effectively provide[s] the defendant with needed educational or vocational training and medical care." Booker, 543 U.S. at 260 (citing 18 U.S.C. § 3553(a)(2)). Section 3582 of Title 18 provides:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2) [of § 3553]." 18 U.S.C. § 3553(a).

Under the Guidelines, the base offense level is 6, and there should be no increases. Mr. Solomon has no criminal history points and is in criminal history category I. The applicable sentencing range under the Guidelines is 0 to 6 months. As noted above, no loss amount is attribute to the offense and, even if applicable, the loss amount adopted by the Probation Office is inflated. Even if the Court found that a loss amount is appropriate, the amount found by the Probation Office should be reduced to less than $30,000, adding 4, not 6 offense levels, and maintaining a range of 0 to 6 months. Moreover, even under the calculations adopted by the Probation Office, Mr. Solomon's sentencing range is 6 to 12 months, but the range is in Zone B, permitting home detention in lieu of incarceration.

Given these Guideline calculations and Mr. Solomon's history and characteristics, a sentence of incarceration is not appropriate. Mr. Solomon is 52 years old and for most of his life has been a law-abiding and productive citizen. As the letters submitted under separate cover attest, he has worked hard to care for his family. He has been a good neighbor and friend to many people, and he has provided valuable services to many patients with limited resources and access to health care.

Mr. Solomon recognizes that he should not have lied on his application. He knows that by doing so he was cheating the Medicare system, but he did not do so with the intend to obtain money that was not earned. He has suffered professional and personal humiliation as a result of the charges, and he knows that he now faces the potential loss of his license and ability to practice as a Physician Assistant. If that occurs, it will be a great hardship to him and his family and more punishment than any sentence this Court could impose. He also knows that if he continues to work in the health care field he can have nothing to do with any billing process.

<u>Conclusion</u>

For the foregoing reasons and such other reasons as may be presented at the sentencing hearing, Mr. Solomon respectfully requests that the Court impose a sentence of supervised release and substitute a period of home confinement for any sentence of incarceration.

        Respectfully submitted,

        /s/

_____
Mary Manning Petras
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.  20001
(202) 208-7500