**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No.  05-205 (RWR)** |
| | : | |
| **v.** | : | |
| | : | |
| **LARRY SOLOMON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM REGARDING**
**THE EVIDENTIARY HEARING SCHEDULED FOR NOVEMBER 1**

The United States of America, by and through its attorney, the United States

Attorney for the District of Columbia, respectfully submits this memorandum regarding the

upcoming sentencing/evidentiary hearing scheduled for November 1.

<u>Introduction</u>

In its Memorandum in Aid of Sentencing, the government concentrated on explaining

how to calculate the loss amount of more than $300,000 which resulted from defendant

Solomon's submission of false claims to Medicare.  In his sentencing memorandum, defendant

Solomon not only disputed the government's calculation of loss, but he also asserted that he did

not "purposely, willfully, or knowingly commit the fraudulent scheme the government has

alleged." (Defendant's PSR Objections and Sentencing Memorandum at p. 4)  Defendant

Solomon further argued that, even if he did commit the scheme, the submission of false claims

should not be considered relevant conduct to the false statement to which he pleaded guilty.  (<u>Id.</u>

at p. 8-9)  In this memorandum, the government demonstrates that defendant Solomon was

responsible for the false claims submitted by BPS Medical.  The government also shows that the

false claims are relevant conduct to the false statement to which he pleaded guilty.

The record[1] shows that defendant Solomon had extensive knowledge of billing which he used to upcode claims in two ways. In one kind of upcoding, defendant Solomon instructed the billers at BPS Medical to submit claims using the UPIN code for Dr. Potts even though defendant Solomon actually had provided the service for which payment was claimed. This procedure raised the amount of money paid by Medicare approximately 15% per claim. Defendant Solomon knew that this kind of upcoding was not justified because he was working alone, without the supervision of Dr. Potts. Defendant Solomon continued this billing practice even though Dr. Potts confronted defendant Solomon several times about it over the years and told him to stop such billing. Documentary proof that defendant Solomon worked on his own comes from two sources. First, the rosters used by BPS Medical show the dates when defendant Solomon visited patients on his own. Second, the exchange of correspondence between defendant Solomon and Dr. Potts at the end of 2003 shows that defendant Solomon made home visits without supervision from Dr. Potts.

In another kind of upcoding, defendant Solomon falsely stated that he was providing services at CPT code level 99349. In fact, defendant Solomon did not spend the 40 minutes in face to face interviews required by CPT code 99349. This conclusion is corroborated in numerous ways: analysis of the rosters proves that defendant Solomon could not have spent 40 minutes with each patient; FBI surveillance observed defendant Solomon leaving a senior citizen residence at 1:20 p.m. but submitting claims for more than 12 hours of work; defendant Solomon pushed Dr. Potts away from home visits for senior citizens because he thought Dr. Potts worked

---

[1] For the Court's convenience, a copy of the government's exhibits referred to in this memorandum will be provided to chambers. Defense counsel already has, or will have, a copy of the exhibits.

too slowly; defendant Solomon performed only basic examinations; defendant Solomon impermissibly claimed that travel time was part of a home visit; patients complained that defendant Solomon was billing for services not rendered; defendant Solomon did not keep progress notes and prescription histories for his patients; and defendant Solomon falsely claimed to have a Ph.D. degree.

Regarding the Guidelines issue, defendant Solomon's false statement on the 2002 application is relevant conduct to the false claims he submitted to Medicare. The false statement and the false claims are part of a common scheme or plan because they are substantially connected to each other by at least one of the following factors: the government as a common victim, a common purpose to obtain money from Medicare, or a similar *modus operandi* of submitting false written information to Medicare on behalf of BPS Medical. In addition to being part of a common scheme or plan, the defendant's false statement also qualifies as relevant conduct to the false claims because each is part of the same course of conduct.

ARGUMENT

I.  The Proper Method for Billing Home Visits.

The CPT codes for home visits.

The government based its loss calculations in this case upon defendant Solomon's false claims to Medicare concerning home visits he made to senior citizens. As background for understanding why defendant Solomon's claims were false, it is important to understand the proper method for billing home visits.

According to the CPT manual[2], the level of a home visit for an established patient

depends upon the type of service provided.  The four possible CPT codes are: 99347, 99348,

99349, and 99350.  The descriptions for these codes are (all emphases are in the original):

**99347**    **Home Visit** for the evaluation and management of an established
patient, which requires at least two of these three key components:

- **a problem focused interval history;**
- **a problem focused examination;**
- **straightforward medical decision making.**

Counseling and/or coordination of care with other providers or
agencies are provided consistent with the nature of the problem(s)
and the patient's and/or family's needs.

Usually, the presenting problem(s) are self limited or minor.
Physicians typically spend 15 minutes face-to-face with the patient
and/or family.

**99348**    **Home Visit** for the evaluation and management of an established patient, which
requires at least two of these three key components:

- **an expanded problem focused interval history;**
- **an expanded problem focused examination;**
- **medical decision making of low complexity.**

---

[2]  The American Medical Association (AMA) issues the Current Procedure Terminology
(CPT) manual.  In the Introduction to the manual, the AMA states that CPT

is a set of codes, descriptions, and guidelines intended to describe
procedures and services performed by physicians and other health
care providers.  Each procedure or service is identified with a five-
digit code.  The use of CPT codes simplifies the reporting of
services.

Inclusion of a descriptor and its associated five-digit code number
in the *CPT* book is based on the procedure being consistent with
contemporary medical practice and being performed by many
practitioners in clinical practice in multiple locations.

Medicare and other insurers rely upon CPT codes when determining amounts to be reimbursed.

4

Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

**99349**        **Home Visit** for the evaluation and management of an established patient, which requires at least two of these three key components:

- **a detailed interval history;**
- **a detailed examination;**
- **medical decision making of moderate complexity.**

Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are moderate to high severity. Physicians typically spend 40 minutes face-to-face with the patient and/or family.

**99350**        **Home Visit** for the evaluation and management of an established patient, which requires at least two of these three key components:

- **a comprehensive interval history;**
- **a comprehensive examination;**
- **medical decision making of moderate to high complexity.**

Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are moderate to high severity. The patient may be unstable or may have developed a significant new problem requiring immediate physician attention. Physicians typically spend 60 minutes face-to-face with the patient and/or family.

The amount Medicare paid for a home visit depended upon the level of service provided.[3] CPT code 99347 receives the lowest payment; CPT code 99350 receives the greatest payment.

The difference between an MD and a PA.

More money is paid at each level when the service is provided by a medical doctor (MD), than when the service is provided by a physician assistant (PA). The higher rate for an MD also can be paid when a PA provides a service while supervised by an MD. For purposes of this case, the government is relying upon the differences in amount paid between CPT codes 99347 and 99349. For instance, in 2004, Medicare paid as follows:

---

[3]    Another CPT code – 99345 – is used for a home visit for a new patient. It is not surprising that a company would use this code rarely because it is reserved for creating a relationship with a new patient. Nonetheless, CPT code 99345 was billed several times in this case. The description for this code is (all emphases are in the original):

**99345**    **Home Visit** for the evaluation and management of an new patient, which requires these three key components:

- **a comprehensive history;**
- **a comprehensive examination; and**
- **medical decision making of moderate to high complexity.**

Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the patient is instable or has developed a significant new problem requiring immediate physician attention. Physicians typically spend 75 minutes face-to-face with the patient and/or family.

|  | PA | MD or PA supervised by MD |
|---|---|---|
| 99347 | $32.74 | $38.51 |
| 99349 | $86.27 | $101.50 |

The chart demonstrates that Medicare paid $68.76 more for a 99349 level home visit made by an MD than it did for a 99347 level home visit by a PA.  Although that $68.76 does not appear to be much money, the evidence in this case shows that difference is multiplied by thousands of home visits.  The result is a loss in excess of $300,000.

Medicare relied upon the unique provider identification number (UPIN) provided on the claim form in order to determine who had provided the service for which a claim had been submitted.  The UPIN is a unique number given to each provider in the Medicare system.  For BPS Medical, defendant Solomon had his own UPIN; and Dr. Charles Potts had a different UPIN.  A Medical Assistant (MA) could not be given a UPIN because Medicare does not pay for services provided by an MA.

Defendant Solomon was an experienced biller.

When evaluating defendant Solomon's conduct in upcoding, it is important to remember his extensive experience as a biller of CPT codes.  Defendant Solomon gained experience with medical billing at least as long ago as 1987 when he falsified Medicaid claims  in Maryland.  As described at pages 2-3 of the "Statement of Facts,"[4] which he signed as part of his 1988 guilty plea:

---

[4]  The Statement of Facts was attached to the government's Memorandum in Aid of Sentencing.

SOLOMON was employed as a physician's assistant and provided primary medical care to Medicaid recipients. SOLOMON was also responsible for submitting Medicaid billings to the Department of Health and Mental Hygiene. All billings reflect that the medical services were provided by a physician's assistant. SOLOMON's signature is affixed to each bill and is countersigned by Leon Brown's signature.

In April, 1987, SOLOMON began making alterations to patient files. The alterations reflected additional services which had not, in fact, been performed. The State would produce witnesses who would testify that they did not receive the services billed to Medicaid.

For example, witnesses would testify that they never visited the clinic on Sunday. However, SOLOMON submitted fifteen (15) billings for medical services on various Sunday. Employees of Safford Clinic would testify that the Clinic was never open on Sundays.

SOLOMON also submitted billings for holidays such as Christmas and Easter. Patients would testify that they did not seek or receive medical services on the holidays billed to the Medicaid program.

At BPS Medical, defendant listed his position as the Vice President of Administration. (Ex. 1, p. 45) He identified himself to Medicare in 2002 as the primary contact at BPS Medical for electronic billing. (Ex. 2, p. 1) He also signed the electronic billing agreement which, among other things, guaranteed that BPS Medical would "submit claims that are accurate, complete, and truthful" (Ex. 2, p. 4, par. 7); that BPS Medical would retain a "source document" for every claim which would reflect the service performed and which could be audited (Ex. 2, p. 4, par. 4, 5, 8); and that signing a claim with the UPIN "constitutes an assurance by the provider that services were performed as billed" (Ex. 2, p. 5, par. 10) For some period of time, defendant Solomon submitted all the claims for BPS Medical; and he continued to submit some claims thereafter. (Ex. 29 at p. 3; Ex. 30 at p. 13) Defendant Solomon was one of those who trained

8

both his adult son, Broderick Solomon, and a young adult neighbor, Brandon Redfield, in billing procedures.  (Ex. 29 at p. 3; Ex. 30 at p. 7, 13; Ex. 35 at p. 85-86; Ex. 39 at p. 11, 26-27, 33) Defendant Solomon knew the importance and meaning of the codes he was using.


II.  The First Kind of Upcoding - Who Performed the Service.

The government's loss calculation takes into account the fact that defendant Solomon upcoded claims to Medicare in two ways.  Each of the upcodes meant that Medicare would reimburse BPS Medical at a higher rate than justified by the service provided.  In one type of upcode, defendant Solomon falsely raised the qualifications of the person who performed the home visit.  For most of these upcodes, defendant Solomon used the UPIN for Dr. Potts when, in fact, the home visit had been conducted by defendant Solomon.  Defendant Solomon also used his UPIN when, in fact, the home visit had been conducted by an MA.  In the other type of upcode, defendant Solomon falsely raised the level of the service provided during a home visit. For these upcodes, defendant Solomon billed for a 99349 level home visit even though he did not provide that level of service.

This section of the government's memorandum will discuss the evidence that defendant Solomon raised the level of the person who performed the service.  By far the most common of this kind of upcoding occurred when defendant Solomon made a home visit but then submitted the claims to Medicare using the UPIN of Dr. Potts.

Rosters rather than UPINs accurately identify Solomon as the provider of a home visit.

It was the policy of BPS Medical to submit claims to Medicare using the UPIN for Dr. Potts instead of the UPIN for defendant Solomon even though defendant Solomon had conducted

9

the home visit for which the claim was made. (Ex. 33 at p. 5; Ex. 36 at p. 62) Defendant

Solomon directed the billers that they should place the UPIN number for Dr. Potts on a claim to

Medicare even though defendant Solomon made the home visit. (Ex. 30 at p. 7-8; Ex. 35 at p.

77, 89; Ex. 36 at p. 54-56; Ex. 39 at p. 26-27, 33) BPS Medical submitted thousands of claims

for home visits made by defendant Solomon under the UPIN for Dr. Potts. In fact, 85% of the

time defendant Solomon made a home visit, it was billed under the UPIN for Dr. Potts. The

UPIN for defendant Solomon was used on a claim to Medicare only approximately 15% of the

times that defendant Solomon actually made a home visit. Accordingly, defendant Solomon

(Defendant's PSR Objections and Sentencing Memorandum at p. 13-14) and the PreSentence

Report (PSR at par. 24) made a fundamental mistake by relying upon the Medicare claims data in

order to determine the number of home visits made by defendant Solomon.[5]

Analysis of the rosters is the proper manner to determine the number of home visits made

by defendant. Rosters[6] streamlined the process for submitting claims to Medicare and Medicaid

by allowing the biller to rely on the roster instead of being required to read each patient file in

order to determine the correct CPT code and UPIN. (Ex. 36 at p. 66-67) Rosters listed the

names of the apartment buildings, the names of the established patients living in each building,

their room numbers, phone numbers, and chronic problems (for instance, "xhtn" for

---

[5] As described in Ex. 9, the rosters reveal that defendant Solomon made 4,528 home visits during 2003-2005. Of these, 3,862 were billed as if they had been made by Dr. Potts. Only 666 were billed as made by defendant Solomon. Defendant Solomon erroneously contends that the number of home visits he conducted can be determined by counting the times his UPIN was included in claims to Medicare. The PreSentence Report mistakenly accepted defendant Solomon's position and therefore concluded that defendant Solomon was responsible only for the home visits claimed under his UPIN.

[6] For examples rosters see Ex. 4, 6, and 21.

hypertension).  (Ex. 36 at p. 9-10, 15)  The template of each roster was stored on a computer, and a roster was printed when an employee of BPS made a home visit.  (Ex. 36 at p. 5)  The name of the employee making the home visit and the date of the visit was typed or hand-written on the roster.  (Ex. 36 at p. 15)  The employee making the home visit placed a check mark next to the name of each person visited. (Ex. 33 at p.2; Ex. 35 at p. 54; Ex. 39 at p. 18)   After the visits were completed, the employee would hand deliver or fax a copy of the roster to the biller who used the roster to submit claims to Medicare.  (Ex. 36 at p. 69)

Because of the way BPS Medical used rosters, it would be just a matter of finding the appropriate roster in order to determine who actually appeared at a particular apartment building on a particular date.  Unfortunately, the disorganized state of the materials found during execution of the search warrants made it difficult to examine the rosters.  Nevertheless, the investigating agents have assembled the rosters with defendant Solomon's name on them, and organized them in chronological order for the years 2003, 2004, and 2005.  For any date, it is a straightforward task to determine whether defendant Solomon was the employee who made the home visit.

Once the rosters for defendant Solomon were organized, it also was a straightforward task to compare the rosters to the Medicare claims data.  If BPS Medical had been billing correctly, the rosters and the claims data would match because whenever defendant Solomon was listed on the roster, his UPIN would be used for the claim.  However, as discussed above, a comparison between the rosters and the claims data revealed an 85% disparity between the number of rosters with defendant Solomon's name on them and the number of  home visits attributed to defendant Solomon's UPIN in the claims data.

<u>Defendant Solomon knew his use of the UPIN for Dr. Potts was not justified.</u>

After separating himself from Dr. Potts in order to work the senior citizen buildings, defendant Solomon visited "his" buildings alone.  As discussed below, Dr. Potts did not accompany defendant Solomon and did not supervise him.   Patients interviewed during the investigation reported that defendant Solomon worked alone or with a woman assistant.  (e.g., Ex. 25-002)  The patients did not know Dr. Potts and did not even recognize Dr. Potts when they saw a photo of him.

Dr. Potts objected to defendant Solomon's practice of using the incorrect UPIN and confronted defendant Solomon about the practice.  Defendant Solomon admitted that using the UPIN of Dr. Potts would produce approximately a 15% increase in the amount of money paid by Medicare,[7] amounting to approximately $6,000 a month in additional income.  Dr. Potts told defendant Solomon that the practice was fraudulent.  Dr. Potts had several discussions with defendant Solomon about how defendant Solomon would try to talk his way out of charges of fraud.  Defendant Solomon told Dr. Potts that the increase was too small to be caught by Medicare and that the senior citizens were not reliable witnesses so he would not get caught. (Ex. 31 at p. 6; Ex. 33 at p. 5)[8]

---

[7]  For instance, in 2004, the payment for a PA on CPT code 99349 was $86.27 versus a payment of $101.50 for an MD on the same code.  The $15.23 difference is approximately a 15% increase.

[8]  Defendant Solomon also knew that Medicaid patients do not receive EOBs (explanation of benefits) and therefore would be unlikely to know that Medicaid had been billed for services not rendered.  (Ex. 29 at p. 2)  By contrast, EOBs were sent to Medicare patients because Medicare pays 80% of the bills for patients under its coverage.  The patient is responsible for a co-payment of 20%.  Medicaid does not have a co-payment.

12

The UPIN policy was based on the fact that Dr. Potts was the medical officer of the BPS Medical and thus, technically, the supervisor of record for defendant Solomon.  (Ex. 30 at p. 8; Ex. 36 at p. 55-56, 61-62)  However, Dr. Potts provided no practical supervision over defendant Solomon because defendant Solomon worked alone after the initial four or five joint visits with Dr. Potts.  (Ex. 29 at p. 2; Ex. 30 at p. 6)   Defendant Solomon had his "own" buildings which he visited and for which he billed.  Dr. Potts became less and less involved in the home visits to senior citizens.  (Ex. 30 at p. 6; Ex. 36 at p. 54, 58, 60)   In fact, defendant Solomon consulted with Dr. Potts about a patient only about six times over the years. (Ex. 30 at p. 9)

Dr. Potts told defendant Solomon about ten times over the years not to bill under his physician number.  (Ex. 30 at p. 8)  When Dr. Potts told him the practice was not correct, defendant Solomon left the impression that he would correct it; but defendant Solomon did not. (Ex. 30 at p. 8)  Dr. Potts told Broderick Solomon to stop billing under his UPIN for defendant Solomon, but Broderick Solomon said that defendant Solomon had approved the practice.  (Ex. 33 at p.5; Ex. 36 at p. 54-55)[9]

Two incidents provide particularly effective corroboration for the fact that defendant Solomon worked without supervision at BPS Medical just as he had worked without supervision beginning in 1987 at the Safford Health Clinic.[10]  The first incident occurred in December 2003,

_____

[9]  This was not the first time defendant Solomon billed under the UPIN of another.  Dr. Banton (the "B" of "BPS Medical") wanted defendant Solomon to stop billing under his number as well. (Ex. 33 at p. 9; Ex. 35 at 90-91)

[10]  The "Statement of Facts" from defendant Solomon's 1988 plea states:

> SOLOMON also agreed to make restitution in the amount of ten thousand dollars ($10,000) for monies received from Medicaid for medical acts performed by him without the supervision of a

when Dr. Potts became so frustrated about defendant Solomon's continuing pattern of fraudulent practices that Dr. Potts wrote to the District of Columbia Health Professional Licensing Administration in order officially to revoke his status as supervisory physician for defendant Solomon.  The second incident occurred in June 2004, when defendant Solomon purchased the rights to visit patients in the remaining six senior citizen buildings which Dr. Potts still was visiting by himself.

December 2003 events confirm defendant Solomon worked without supervision.

In December 2003, Dr. Potts received written complaints that defendant Solomon was billing for services not provided in at least three senior citizen apartment buildings.  One complaint came from the Community Relations Coordinator of the District of Columbia Housing Authority.  In a letter, the Coordinator said that she had received a number of complaints from senior citizens in two buildings that defendant Solomon was writing prescriptions for seniors without "physically checking up on them."  (Ex. 11)  Another written complaint came from the President of the Carroll Apartment Resident Council, who had received "numerous complaints from residents about billings received from Dr. Solomon for service not performed."  (Ex. 10) Dr. Potts responded in writing that the complaints would be taken very seriously.  (Ex. 12)

---

practicing physician. SOLOMON routinely conducted physical and gynecological examinations, diagnosed illnesses, and prescribed medication. . . .

Medicaid regulations require that a physician's assistant work under the direct supervision of a physician. It is unlawful for a physician's assistant to practice independent of a physician.

These letters culminated a long standing disagreement between Dr. Potts and defendant Solomon about how the business should operate.  Dr. Potts had told defendant Solomon to do things correctly, but every year things were done differently.  (Ex. 31 at p.2)  Dr. Potts had confronted defendant Solomon about the fraud being committed, yet defendant Solomon had not changed. (Ex. 31 at p. 6; Ex. 33 at p. 5, 6)

On December 26, 2003, Dr. Potts wrote a memo to defendant Solomon entitled, "Re: Termination of Clinical/ Operational Services."  (Ex. 13)[11]  The memo began by referring to the complaints: "In response to verbal and written correspondence received from patients, the District of Columbia Housing Authority, and Trailblazer, representing Medicare . . ."  Then Dr. Potts  "suspended" defendant Solomon "for 90 days without compensation" and demanded to receive within ten days "all documentation of clinical care and billing information rendered in the name of BPS Medical . . . and Charles E. Potts, M.D."  (Ex. 13)  Dr. Potts said that he might refer the matter to "Medicaare/Medicaid administrations for independent evaluation at their discretion" if defendant Solomon did not comply or if there were "sufficient grounds to validate the complaints of patients and their representatives."  (Ex. 13)

Along with the memo Dr. Potts wrote a letter to defendant Solomon saying that he had "decided to terminate my working relationship with you" on December 31, 2003.  (Ex. 14)  Dr. Potts wrote that he was "frustrated by [defendant Solomon's] intentional lack of

---

[11]  During his interviews with investigators, Dr. Potts provided drafts of several letters intended for defendant Solomon; but Dr. Potts did not remember exactly which ones he delivered to defendant Solomon.  Accordingly, the only letters from Dr. Potts described here are those which were found during execution of the search warrant at the office of BPS Medical.

accomplishment" in the areas of "proper management controls, financial controls, and a sound legal structure." (Ex. 14)

Defendant Solomon replied in a letter dated December 27, 2003, which acknowledged that Dr. Potts never got involved in management and left difficult decisions to him. (Ex. 16 at p. 2) Defendant Solomon suggested four methods for ending their association. (Ex. 16 at p. 2) The next day, December 28, defendant Solomon also replied to the memo from Dr. Potts dated December 26. In the reply memo, defendant Solomon said he had not received enough information to investigate the allegations against him and that Dr. Potts had told him not to investigate them. Defendant Solomon protested his suspension for 90 days because the "company would surely suffer financially with me not being able to continue" and it would not be in "the best interest of the patients." (Ex. 15 at p. 2) Defendant Solomon suggested that Dr. Potts "step down from being the medical supervisor for Larry Solmon and have the company bring in another supervisor for him." (Ex. 15 at p.2)

On December 31, 2003, defendant Solomon and Dr. Potts signed an "Agreement in Principle" formally dividing the business between them. (Ex. 17) The terms of the agreement demonstrate, however, that defendant Solomon long had been in control of home visits to senior citizens. For instance, according to the patient volume "determined by Larry Solomon," only Dr. Potts visited group homes.[12] In an effort to equalize the number of patients each was visiting, defendant Solomon calculated that he needed to "transfer" 70 senior citizen patients to Dr. Potts. (Ex. 17 at par. 5) As a result of these calculations, defendant Solomon retained 286 senior citizen patients residing in 22 of the 27 senior citizen apartment buildings. (Ex. 17 at par. 3-6).

---

[12] Group homes were for people with mental disabilities. (Ex. 35 at p. 24)

This official, written recognition of the number of senior citizens visited by defendant Solomon confirms what was already evident from the rosters – that defendant Solomon, rather than Dr. Potts, was making most of the home visits to senior citizens.  Dr. Potts concentrated on visiting disabled persons in group homes.  (Ex. 30 at p. 9; Ex. 36 at p. 53)

After the Agreement in Principle was signed, Dr. Potts wrote a letter officially withdrawing as the nominal supervisor for defendant Solomon.  (Ex. 33 at p. 6)[13]  On January 7, 2004, the District of Columbia Health and Professional Licensing Administration notified defendant Solomon in writing as follows:

> This letter is in response to the enclosed letter that the Board has received from your former supervisory physician, Dr. Charles E. Potts.  In order to be in compliance with the HORA (Health Occupation Revision Act) you must file a new agreement before practicing in D.C.  Please call me, should you have any questions at (202) 442-4768.

( Ex. 18)  Defendant Solomon did not file a new agreement, however.  Instead, defendant Solomon continued to make home visits to senior citizens just as he had been doing all along.  In fact, it was not until October 6, 2005, which was long after he was indicted and arrested, that defendant Solomon filed a new supervisory agreement with the District of Columbia government.

---

[13]  Eventually Dr. Potts decided to report defendant Solomon's conduct to law enforcement.  On March 8, 2004, Dr. Potts made a formal complaint to health care fraud investigators at the DC Office of the Inspector General about defendant Solomon's activities.  Dr. Potts debriefed with investigators at that time.  (Ex. 29)  His cooperation continued throughout the course of the investigation.  Dr. Potts debriefed with investigators at least twice during 2005.  (Ex. 30, 31, 32)  In January 2006, after he obtained counsel, Dr. Potts debriefed again based upon a proffer letter.  (Ex. 33 at p.1)

Defendant Solomon regained control of the remaining senior citizen buildings from Dr. Potts.

Defendant Solomon was not content to give up the senior citizens for whom he had been submitting claims.  Within a few months, defendant Solomon began negotiating with Dr. Potts to buy back the senior citizens who had been "transferred."  On June 11, 2004, defendant Solomon proposed regaining control of five additional senior citizen buildings.  Defendant Solomon offered to pay Dr. Potts $36,000, spread out more than twelve monthly payments of $3,000 each for the exclusive right to visit patients in these buildings. (Ex. 30 at p. 11; Ex. 33 at p. 6; Ex. 19) Dr. Potts agreed on June 15.  (Ex. 19)  Because of that buyout, Dr. Potts was confined to visiting patients in group homes.  (Ex. 30 at p.9;  Ex. 36 at p. 53)

Defendant Solomon also knew billing for an MA was illegal.

In a related kind of upcoding, defendant Solomon billed Medicare for home visits made by MA Price as if the visits had been made by defendant Solomon, a PA.  (Ex. 29 at p. 2) Defendant Solomon initially told Dr. Potts that it was acceptable to bill for a nurse's work, but Dr. Potts later learned that was not true.  When Dr. Potts confronted him about the practice, defendant Solomon acknowledged that services provided by a nurse could not be billed. (Ex. 31 at p. 11; Ex. 33 at p.8)   As a result, Dr. Potts told a nurse who was working for him to leave the business.  (Ex. 31 at p. 11)  Defendant Solomon continued using MA Price, however.   In total defendant Solomon billed Medicare 147 times for home visits made by MA Price as if defendant Solomon had made the visits.  The loss to Medicare from this upgrade was more than $13,000.

<u>III.  The Second Kind of Upcoding - What Service was Provided.</u>

<u>Defendant Solomon falsely claimed that he was providing services at CPT code level 99349.</u>

The second kind of upcoding perpetrated by defendant Solomon was using CPT code 99349 when there was no basis to do so.   Both Broderick Solomon and Brandon Redfield said that defendant Solomon instructed them to submit CPT code 99349 on the claim form for each patient unless a different code was written on the roster, something which was extremely rare. (Ex. 36 at p. 59-60, 69-71; Ex. 39 at p. 12, 27).[14] As described above, CPT code 99349 required a "detailed" interval history, a "detailed" examination; and "medical decision making of moderate complexity."  CPT code 99349 anticipates that "[p]hysicians typically spend 40 minutes face-to-face with the patient."

There are more than half a dozen sources of evidence which corroborate the conclusion that defendant Solomon did not provide a home visit at a level of CPT code 99349:  1) the rosters completed by defendant Solomon himself reveal excessive billing; 2) surveillance confirmed that defendant Solomon left a senior citizen residence early; 3) defendant Solomon pushed Dr. Potts away from home visits for senior citizens because he thought Dr. Potts was slowing him down; 4) examinations performed by defendant Solomon were below the level of CPT code 99349; 5) defendant Solomon impermissibly included travel time when claiming for CPT code 99349; 6) many patients complained that defendant Solomon billed for services not provided; 7) defendant

---

[14]  Broderick Solomon said differing things about the meaning of CPT code 99349. Although Broderick Solomon acknowledged that CPT codes were based on the time spent with the patients (Ex. 35 at p. 9), at the time the search warrants were executed in May 2005, he initially told investigators that 99349 was the code for a short visit.  (Ex. 34 at p. 2)  Later, in the grand jury on August 23, 2005, he said 99349 was the code for an intermediate visit lasting 25 to 40 minutes (Ex. 35 at p. 84-85).  Broderick Solomon acknowledged that defendant Solomon had told him what to bill. (Ex. 36 at p. 69-71)

Solomon did not keep progress notes or copies of prescriptions in the patient files; and 8) defendant Solomon falsely claimed he had a Ph.D. degree.

Rosters reveal that defendant Solomon did not provide service at level CPT code 99349.

The greatest amount of proof that defendant Solomon was not providing home visits at a level of CPT code 99349 comes from the rosters that defendant Solomon himself completed. Defendant Solomon knew that each check mark he placed next to a patient's name would be counted as a home visit at CPT code 99349 because that is what he instructed Broderick Solomon and Brandon Redfield to do when they billed Medicare and Medicaid. (Ex. 36 at p. 54-56; 69-71; Ex. 39 at p. 11, 26-27, 33) Two examples of excessive billing were included in the government's original sentencing memorandum: March 16, 2005 and July 9, 2004.

March 16, 2005

Defendant claimed to have provided services to 41 people at a senior building on March 16, 2005. (Ex. 4) If each visit really had lasted for typical "40 minutes face-to-face" time described for CPT code 99349, it would have taken defendant more than 27 hours to see all the people that day. Even the time required to see only the 35 people for whom Medicare was billed would have required the defendant to work more than 23 hours that day.[15] Obviously, defendant did not provide home visits at a level of CPT code 99349.

July 9, 2004

Defendant claimed to have provided services to 30 people at a senior building on July 9, 2004. (Ex. 6) If each visit really had lasted the typical "40 minutes face-to-face" time described

---

[15] The government does not been able to obtain the billing data from Medicaid which would allow it to know which claims actually were paid by Medicaid.

for CPT code 99349, it would have taken defendant Solomon more than 20 hours to see all the patients that day.  However, the sign-in sheet at the building for that day shows that defendant stayed for just one hour and fifteen minutes.  (Ex. 5)  Even the time required to see only the 16 people for whom Medicare was billed (Ex. 7) would have required the defendant to fit more than 10 hours of work into an hour and a quarter.  Again, it is obvious that defendant Solomon did not provide home visits at a level of CPT code 99349.

119 more examples of upcoding.

Those are but two examples of dates for which defendant Solomon submitted claims on which the level of service had been upcoded.  As a way to gauge the pervasiveness of this upcoding, Agent Queener created a chart of some "high dates" on which defendant Solomon was paid by Medicare for completing 16 or more home visits at the level of CPT code 99349.  (Ex. 20) This chart was created based upon the rosters in the name of defendant Solomon between January 2003 and April 2005.  The chart is quite conservative in that it includes only the times that 16 or more Medicare claims were paid.  It does not include the many Medicaid claims which were submitted for those dates,[16] nor does it include the times in which a Medicare claim was disallowed.[17]  Similarly, the chart does not include dates for which defendant Solomon billed fewer than 16 Medicare patients but on which Medicaid patients were billed.  The chart

---

[16]  Broderick Solomon identified Medicare patients by placing an infinity symbol next to their names on the roster.  He identified Medicaid patients by placing a dash and a file number next to their names.  (Ex. 35 at p. 52; Ex. 36 at p. 46-47)   Brandon Redfield differentiated between Medicare and Medicaid claims by putting a dash next to the Medicaid claims.  Redfield did not mark the Medicare claims.  (Ex. 39 at p. 32-33)

[17]  As explained below, complaints from patients led to some claims being disallowed.

nonetheless shows 119 more dates[18] on which defendant Solomon claimed that he provided a

home visit at a level of CPT code 99349 for 16 or more Medicare patients.   If each of these 16

visits averaged "40 minutes face-to-face," as described by CPT code 99349, then defendant

Solomon would have spent more than 11 hours each day just visiting the Medicare patients.  This

would not include any time spent with the Medicaid patients, or time spent for travel, lunch, or

breaks.

Surveillance on November 23, 2004, confirmed upcoding.

Surveillance confirmed that defendant Solomon upcoded claims to Medicare.  On

November 23, 2004, Agent Queener and another agent went to Harvard Towers at 1845 Harvard

Street, N.W., where they saw defendant Solomon leaving the apartment building at 1:20 p.m.

Defendant Solomon was followed until he arrived at his house at 6:15 p.m.  At no time during

the afternoon did defendant Solomon return to Harvard Towers.

The roster for November 23, 2004, for Harvard Towers is two pages long.  (Ex. 21)  "Dr.

Solomon" is listed as the person providing the home visits that day.  Comparing the roster to the

billing data reveals that Medicare paid for 19 home visits that day.  In addition, check marks

were made next to several Medicaid patients just on the first page alone.  (Ex. 21)[19]  If just each

Medicare home visit had been "40 minutes face-to-face" with the patient, defendant Solomon

would have spent a minimum of 12.6 hours at the apartment building that day – just for the

---

[18]  Although March 16, 2005, is included among 120 dates on the "high dates" chart, July
9, 2004, is not included.  Thus, the list is conservative also because not all high dates are
included.

[19]  The second page with check marks was not found for Harvard Towers on November
23, 2004.

22

Medicare claims which were paid.  Of course, defendant Solomon was not there even remotely that long.

Defendant Solomon pushed Dr. Potts aside for slowing him down.

Although Dr. Potts initially tried four or five times to make home visits together with him, defendant Solomon pushed Dr. Potts away and began making home visits to senior citizen buildings all by himself.  (Ex. 30 at p. 6; Ex. 35 at p. 34; Ex. 36 at p. 58-62)  Defendant Solomon told Dr. Potts that Dr. Potts was slowing him down.  (Ex. 29 at p. 2; Ex. 30 at p. 6)   Defendant Solomon not only said this directly to Dr. Potts, but defendant Solomon also made it common knowledge in the company.  For instance, Broderick Solomon said that Dr. Potts was "a little slower than we needed." (Ex. 36 at p. 60; see also Ex. 36 at p. 54-55, 58)

However, Dr. Potts' description of his home visits demonstrates that he would not have slowed down defendant Solomon – if defendant Solomon had been providing service at a level of 99349.  Dr. Potts said that his procedure was to check vital signs, arrange for medical equipment, arrange home health care, and write prescriptions (Ex. 30 at p.7)   Dr. Potts spent 15 to 20 minutes on these activities.  Dr. Potts had not read the CPT code book, but he felt code 99349 was equivalent to a routine office visit which would last 15 to 20 minutes. (Ex. 30 at p. 11; Ex. 33 at p. 10)  Dr. Potts said that providing a thorough home visit made it impossible to visit all the patients in an entire apartment building in one day.  (Ex. 31 at p. 4)

Defendant Solomon performed quick, basic examinations.

Ms. Levone Price was an MA who began working for defendant Solomon in February 2004.  (Ex. 40 at p. 6)  Defendant Solomon hired her, and he supervised her.  (Ex. 40 at p. 5-6, 8) From about June to August or September 2004, Ms. Price made home visits to senior citizens.

Defendant Solomon was the only supervisor Ms. Price had when she made home visits to senior citizens. (Ex. 40 at p. 5, 24)   For the first two to three months, Ms. Price accompanied defendant Solomon as he made home visits.  Then she began to make the visits on her own.  (Ex. 40 at p. 13-14)  She was ordered to do 15 patients per day which took about 6 and ½ to 7 hours a day.  (Ex. 40 at p. 25, 38)   Ms. Price simply received a salary for her work.  She did not know what CPT codes were, and she had nothing to do with the billing.  (Ex. 40 at p. 23, 29)  Ms. Price stopped making home visits when she was replaced by a PA, who had more training than she did. (Ex. 40 at p. 25-26)

Ms. Price described the very little difference between the service she provided on a home visit and the service provided by defendant Solomon.  (Ex. 40 at p. 40-41)  Ms. Price primarily checked the patient's blood pressure.  She also would do finger sticks of diabetics to check blood sugar levels.  (Ex. 40 at p. 6, 14-15)  Ms. Price did not do much else because she did not even bring a thermometer on home visits.  Ms. Price spent a maximum of 15 minutes with each patient, and sometimes she would spend less time with a patient.  (Ex. 40 at p. 14-15). Defendant Solomon did the same check of the patient's blood pressure and blood sugar.  In addition, defendant Solomon might write prescriptions, sometimes listen to the heart and lungs of a patient, and clip toenails for some diabetics.  (Ex. 40 at p. 40-41)  Because the visits were so brief, it is debatable whether these "examinations" even would qualify as a home visit at the level of CPT code 99347 (straightforward medical decision making which lasted 15 minutes).  After all, blood pressure readings can be obtained for free at grocery stores and pharmacies, and blood sugar monitors are available for use by diabetics at home.  Nonetheless, for purposes of its loss calculation, the government does not press this point.  However, there is no basis for concluding

defendant Solomon's visits amounted to a "detailed examination" which involved "medical decision making of moderate complexity" as required for CPT code level 99349.

Broderick Solomon described his father's work similarly. Broderick Solomon accompanied his father on home visits as many as 20 times over a period of three years. Defendant Solomon would talk with patients, take their blood pressure and pulse, and check their breathing. He also would cut toe nails, lance boils, and give injections. More complicated work was referred to the clinic. (Ex. 35 at p. 28-31). Broderick Solomon said visits to 30 patients could last as long as three to five hours, or even an entire day. Broderick Solomon had seen his father work an entire day on two or three occasions. An entire day would be required if patients had severe or numerous problems. Broderick Solomon estimated that, for example, defendant Solomon would work from about 10 a.m. until about 6:00 or 7:00 p.m. and see about 25 patients during that time. (Ex 35 at p. 31-33) Assuming that defendant Solomon saw the patients without stopping to eat lunch or take breaks of any kind, seeing 25 patients over a nine-hour period would mean that defendant Solomon averaged approximately 20 minutes treating each patient, well below the requirements of CPT code 99349.

Defendant Solomon upcoded by including travel time as part of a home visit.

All the CPT codes anticipate "face-to-face" visits between the medical provider and the patient. There is no basis for including travel time. However, Broderick Solomon said that defendant Solomon directed that travel time be included in deciding which CPT code should be used for a home visit. (Ex. 36 at p. 66-68) Although Broderick Solomon claimed that Dr. Potts approved of including travel time (Ex. 36 at p. 67), Dr. Potts never agreed with defendant Solomon that travel time could be counted as time for 99349 billing. (Ex. 33 at p. 8)

<u>Patients complained that defendant Solomon was billing for services not rendered.</u>

Each of the two letters received by Dr. Potts in December 2003, were representative of the complaints being made by many patients against defendant Solomon. The letters themselves referred to multiple complaints made by senior citizen patients against defendant Solomon for billing without providing service at all, let alone at the level of CPT code 99349. Dr. Potts also heard complaints against defendant Solomon from other senior citizen buildings Dr. Potts visited. (Ex. 30 at p.7; Ex. 31 at p. 4) During his interviews with agents, Dr. Potts gave specific examples of false billing including a complaint that defendant Solomon would bill Medicare even if he just waved to a patient he passed in the hall. (Ex. 29 at p.3)

Ms. Levon Price, an MA who made home visits with defendant Solomon during 2004, also received complaints from patients that defendant Solomon was billing for services not rendered. She always made sure that defendant Solomon knew about the complaints she received. (Ex. 40 at p. 30-31).

In addition, complaint letters about failing to provide services were sent to defendant Solomon's business directly. For example, in a letter dated December 4, 2003, Mr. Mouring complained that he had not received the B-12 and flu shots for which Medicare had been billed. Mr. Mouring ended by saying: "if you knock on my door and I'm not home I don't call that a house call." (Ex. 22) Mr. Mouring's letter was found among the records seized during execution of the search warrant at the office in May 2005. The rosters show that Mr. Mouring was a regular patient of defendant Solomon's and that defendant Solomon placed check marks next to Mr. Mouring's name during 2003.

An official complaint letter was found in defendant Solomon's car during the search executed in May 2005 (Ex. 23).  The letter was from Medicare, and it was dated November 11, 2003.  The letter referred to services allegedly provided to Ms. McClinnhan, and it stated, in part:

> Medicare processed claim 1103231046700 in the amount of $130.00.  This claim was in error for home visit on August 18, 2003.  An overpaid amount of $100.06, which is 80% of $125.07, was issued to you.

> This claim is overpaid because the patient states she did not receive this home visit. (Ex. 23 at p.1)

The letter went on to state that if repayment were not made, Medicare would offset the overpayment from future payments.  The rosters show that Ms. McClinnhan was a regular patient of defendant Solomon in 2003.[20]  However, the August 18 overpayment was not counted as a loss because Medicare's billing data shows that the payment was recouped from BPS Medical.  Therefore, this payment was not included in the claims data used by Agent Queener to calculate the loss.[21]

Carrie Ruiz, an investigator with TriCenturion, which is a Medicare program safeguard contractor, conducted a patient survey in February 2003.  (Ex. 24)  The investigator telephoned 16 patients who had complained about BPS Medical/defendant Solomon/Dr. Potts.  The

---

[20]  The roster for August 18, 2003 was not found.  However, rosters listing Ms. McClinnhan as a patient for defendant Solomon were found for various dates, such as June 18, 2003.

[21]  When Medicare recouped overpayments because of  patient complaints, the payments were deleted from Medicare billing data.  Thus, the loss amount of $300,000 does not include these attempts to obtain money by fraud which were discovered and recouped.  Because the Guidelines would allow such attempts to be included in the loss amount as "intended loss," see Commentary Note 3 to §2B1.1; this is yet an additional reason that the loss amount of $300,000 is a conservative estimate.

telephone survey revealed that almost all the patients said they had seen defendant Solomon.  The various complaints about defendant Solomon included that he billed without seeing them (e.g., patients Cockeran, Dubose, Miller), that he provided minimum services such not even taking blood pressure (e.g., patients Stafford, Archie), and that he stayed only five minutes (e.g., patients Smith, Jones).

During the investigation of defendant Solomon, agents continued to interview patients about his conduct, and the interviews of more than 20 additional patients are included at Ex. 25. No one described being seen under conditions constituting a "detailed examination" involving "medical decision making of moderate complexity" as required by CPT code 99349.  Patients said defendant Solomon checked their vital signs, such as blood pressure, heart, lungs and blood sugar, and sometimes provided prescriptions.  However, patients also said defendant Solomon billed without providing service (e.g., Ex. 25-4; 25-27; 25-45; 25-50).  One property manager said that she was suspicious of defendant Solomon because her mother's name was on his roster even though the mother did not live in the apartment building anymore.  She learned from several residents that defendant Solomon was billing for services not provided.  (Ex. 25-31)  Several of the patients said that defendant Solomon appeared for only a few minutes.  (E.g., Ex. 25-48; 25-49)  One patient said, for example, that defendant Solomon was "in and out" in less than five minutes.  (Ex. 25-47)  Another patient said that defendant Solomon came to her room, "knocked on the door and that he just walked in and walked out." (Ex. 25-6)   The investigation interviewed six patients who said that defendant Solomon stayed as long as 30 minutes (e,g., Ex. 25-36; 25-43), but one of these patients later said visits from defendant Solomon lasted only about 20 minutes; and even she experienced an instance of billing for services not rendered.  (Ex.

25-36 through 25-39)  Only one of these patients said that defendant Solomon stayed 35 to 40 minutes on a visit, but she too said defendant Solomon just checked her blood pressure, heart, and lungs.  (Ex. 25-18).[22]

There is no question that defendant Solomon knew that these complaints were being made, yet he persisted in billing for services he did not provide.  Dr. Potts had several discussions with defendant Solomon about the fraud defendant Solomon was committing.  (Ex. 31 at p. 6).  MA Levon Price also testified that she informed him about patient complaints that he was billing without providing services.  She "definitely always told him, and it was always in black and white somewhere what they said, and I made sure he knew what they said.  " (Ex. 40 at p. 31) And, of course, the official complaint about Ms. McClinnhan was found in defendant Solomon's car.

Defendant Solomon did not keep progress notes and prescription histories for his patients.

Defendant Solomon's haphazard approach to home visits is reflected in the deplorable state of the medical files relating to his home visits.  The medical files for home visits were kept in distinctive red file folders.  (Ex. 33 at p.1; Ex. 35 at p. 77-79; Ex. 40 at p. 21)  Each file should have contained the medical history of the patient, including progress notes and prescriptions.  Documentation in the red file folders should have shown changes over time of the patient's blood pressure, pulse, and blood sugar.  It also should have provided a history of the

---

[22]    The fact that a few patients thought defendant Solomon stayed as long as 30 minutes does not change the loss calculation because he provided the same "examination" to the patients.  The government's loss calculation credits defendant Solomon with visiting every patient at the level of CPT code 99347 despite evidence that he frequently did not provide even that level of service.  A few 30 minute visits do not offset the routine upcoding in which he engaged.

medications prescribed by defendant Solomon.  Instead, the files for home visits made by

defendant Solomon contained little or no information either for medical history or for billing

purposes.  (Ex. 3 is an example of a red folder file)

Defendant Solomon certainly knew the progress notes were important because MA Levon

Price regularly completed her progress notes and provided them to defendant Solomon for

review.  He would then return them to her for placement in the files (Ex. 40 at p. 20, 22)   Many

of the progress notes completed by Ms. Price were found during execution of the search

warrants.  That was not the case regarding the progress notes for which defendant Solomon was

responsible.  Even though defendant Solomon completed more than 4,500 home visits, only a

few hundred progress notes for home visits were found scattered throughout the files during

execution of the search warrants.   Many of these were no doubt due to the efforts of Ms. Price

who made some entries on the progress notes for him, but it was his responsibility to complete

them.  (Ex. 40 at p. 17-19)   Just as he failed to keep progress notes for his patients, defendant

Solomon did not keep prescription histories for his patients.  Rather than ensure prescriptions

were included in the medical files as a record of treatment for each person, defendant left the few

prescriptions which could be found scattered about his house and car.   The state of defendant

Solomon's medical record keeping confirms that he was not conducting "detailed examinations"

which involved "medical decision making of moderate complexity" as required by CPT code

33949.

Defendant Solomon's false claim to have earned a Ph.D. degree corroborates his fraud scheme.

Defendant Solomon's false statement denying his adverse legal history on the 2002

application for BPS Medical to become a Medicare provider was not an isolated

30

misrepresentation about his credentials.  As part of his scheme, defendant Solomon submitted

false claims which made it appear that services actually provided by him were provided by an

MD.  In addition, defendant Solomon's use of a Ph.D. degree would make his conduct appear

legitimate.  There are several instances in which he fraudulently claims to be a Ph.D. in a manner

which corroborates the billing scheme.  The sign on the front door of BPS Medical proclaimed:

"Larry Solomon, Ph.D., PAC."  (Ex. 26)  In addition, MA Levon Price thought that defendant

Solomon was a Ph.D. because of the business cards he distributed.  (Ex. 40 at p. 28)  Even his

son, Broderick, thought defendant Solomon had Ph.D.in psychology.  (Ex. 35 at p. 8).

To the contrary, defendant Solomon has not earned a Ph.D degree.  Although, in the past,

defendant Solomon claimed to have received a Ph.D. from Alabama State University, the

diploma in his name is a fake.  (Ex. 28)  This forgery was discovered during the investigation of

defendant Solomon's conviction in 1988 for Medicaid fraud and was confirmed by the

university.  (Ex. 27)

## IV.  Defendant Solomon's false statement is relevant conduct to the false billing.

"In order to sentence a defendant under the Guidelines, the district court must determine

the 'relevant conduct' for which that defendant is responsible."  United States v. Mellen, 393 F.3d

175, 182 (D.C. Cir. 2004). "Relevant conduct" includes "all acts and omissions committed,

aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant

. . . that occurred during the commission of the offense of conviction, in preparation for that

offense, or in the course of attempting to avoid detection for that offense."  § 1B1.3(a)(1)(A).

For offenses that should be grouped under § 3D1.2(d) -- such as the false statement offense to

which the defendant pleaded guilty -- relevant conduct includes all acts "that were part of the

same course of conduct or common scheme or plan as the offense of conviction."  § 1B1.3(a)(2).

The government has the burden of proving relevant conduct at sentencing, but need do so only by

a preponderance of the evidence.  United States v. Pinnick, 47 F.3d 434, 437 (D.C. Cir. 1995);

United States v. Dorcely, 454 F.3d 366, 371 (D.C. Cir. 2006).  A district court's "relevant

conduct" determination is reviewed for clear error.  United States v. Seiler, 348 F.3d 265, 268

(D.C. Cir. 2003);  United States v. Leonzo, 50 F.3d 1086, 1088 (D.C. Cir. 1995) (loss

calculation); Pinnick, supra, 47 F.3d at 437.  Cf. Mellen, supra, 393 F.3d at 183 (due deference

standard applies when "relevant conduct" issue involves application of the Guidelines to the

facts).

In this case defendant Solomon's false statement on the 2002 application and the false

claims are part of a common scheme or plan because they are "substantially connected to each

other by at least one common factor, such as common victims, common accomplices, common

purpose, or similar modus operandi." Guidelines § 1B1.3, Application Note 9(A).  In fact,

defendant's false application and the false claims are substantially connected by at least three of

these tests.  First, the false statement and the false claims were submitted to the same victim -

Medicare.[23]  This is sufficient, in and of itself, to satisfy the test for common scheme or plan

because they are "connected to each other by at least one common factor."  United States v.

Buck, 324 F.3d 786, 796 (5th Cir. 2003) (emphasis in original).  Second, the false application

and the false claims had the common purpose to obtain money from Medicare.  Although it did

not produce an immediate payment, defendant Solomon's false statement in the application (that

---

[23]  As insurance carriers, Medicare, Medicaid, and private insurance companies are
common victims regarding the false billing scheme.

he had no adverse legal history) hid the fact that he had been excluded from the Medicare

program after his 1988 conviction for Medicaid fraud and was thus ineligible to submit claims in

the first place.  (Ex. 8)  Only by hiding his adverse history could defendant Solomon ensure that

BPS Medical would be able to submit claims to Medicare.   In fact, the first paragraph of the

application describes the relationship between the application and the ability to submit claims:

> The information collected in this application will be used to ensure
> that payments made from the Medicare trust fund are only paid to
> qualified health care suppliers, and that the amounts of the
> payments are correct.  This information will also identify whether
> the supplier is qualified to render health care services to Medicare
> beneficiaries.  To accomplish this, Medicare must know basic
> identifying and qualifying information about the supplier that is
> seeking billing privileges in the Medicare program. (Ex. 1, p. 1)

Third, defendant Solomon committed the false statement and the false billing in a similar

manner.  Defendant Solomon submitted both the false statement and the false claims in written

form (either in a hard copy or electronically) to Medicare in the name of BPS Medical.   This

satisfies the test of using a "similar *modus operandi*."[24]

Defendant Solomon's submission of the false application and the false claims are more

closely related to each other than the conduct in Buck, supra, in which two separate incidents

were held to be relevant conduct to each other.  In Buck, the defendant used a non-profit

organization for which she worked to defraud grant funds from AmeriCorps as well as grant

funds from the Department of Labor Welfare-to-Work program.  Id. at 789 and 796.  The

defendant used the funds acquired by each fraud to pay for numerous activities relating to the

---

[24]  Although it is not necessary because any one of the prior three tests satisfies the
definition of common scheme or plan, the government also points out that defendant Solomon
submitted his false statement and false claims using the same accomplice - the company BPS
Medical.

operation of the non-profit for which she worked rather than for the limited purposes for which the grants were specified.  Id. at 797.  The Fifth Circuit held that the frauds were relevant conduct despite being "distinguished by obvious differences," namely the misapplication of funds from two different federal grant programs, because both frauds shared the common purpose of propping up the cash-strapped non-profit organization; had the government as a common victim; and had a similar *modus operandi*.  Id. at 794 and 797.  The same conclusion applies in the instant case.

In addition to being part of a common scheme or plan, the defendant's falsehoods also qualify as relevant conduct because they clearly are part of the same course of conduct.  The Guidelines provide that offenses that do not qualify as part of a common scheme or plan "may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  § 1B1.3, Application Note 9(B).  Here, the defendant's falsehoods certainly qualify as a sufficiently connected or related ongoing series of offenses, as his false statement on the Medicare application enabled BPS Medical to submit the false claims in the first place.  "Factors that are appropriate to the determination of whether offenses are . . . to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."  Id.  The absence of one of these factors is not dispositive but just requires a stronger presence of at least one of the other factors.  Id.

The defendant's offenses are very similar because they both involve the submission of documents containing falsehoods to Medicare, and they were both carried out to enrich himself

and BPS Medical at the expense of Medicare.  The offenses are also very similar in that they

involve the same company, BPS Medical, filing documents with false statements to Medicare.  In

regard to the time interval factor, only a short time period elapsed between the submission of

BPS Medical's application to Medicare on May 31, 2002, and the commencement of the false

claims.  As shown in the chart of the High Dates of Service (Ex. 20), defendant Solomon was

submitting false claims to Medicare at least as early as January 2003.  In addition, the patient

interviews conducted in early 2003 revealed that complaints about defendant Solomon's false

claims extended back into 2002.  (Ex. 24, e.g., patients Smith, Stafford, Jones and Ex. 41)  In

regard to the regularity factor, the application and the subsequent claims were the types of

documents necessary to obtain payments from Medicare.  The application needed to be approved

before the claims could be submitted.  Thus, false statement and the false claims were part of the

same procedure.  Further, defendant Solomon submitted thousands of false claims to Medicare.

Under any part of this test, therefore, the false statement and the false claims were "part of a

single episode, spree or ongoing series of offenses." § 1B1.3, Application Note 9(B).

Defendant Solomon cites to three cases as support for his contention that the false

statement and the false claims are not relevant conduct.  Each readily is distinguishable from the

instant case.  In United States v. Jones, 948 F.2d 732, 737-38 (D.C. Cir. 1991), a prior art gallery

embezzlement committed by the defendant was not considered relevant conduct to the two

counts of mail fraud for which the defendant pleaded guilty because the embezzlement scheme

clearly could be separately identified from the mail fraud and was a crime of a different nature.

In reaching its decision, the Court of Appeals noted that the embezzlement occurred over a year

earlier and the offenses involved different individuals.  Id. at 737.  Certainly, the Guidelines

35

provide that the "nature of offenses" and whether they can "readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing" are factors to be considered in determining if offenses are part of the same course of conduct.  Guidelines § 1B1.3, Application Note 9(B) & Backg'd.  Here, however, defendant Solomon's offenses are of the same nature because they involved a common victim, purpose, and method, as discussed above.  His offenses cannot be readily broken into discrete units because they are connected to each other, as the false statement on the application enabled him to commence submitting the false claims.  Furthermore, as discussed above, Mr. Solomon's offenses are very similar, were committed within a short time interval and had a regularity to them so as to be considered part of the same course of conduct.

It is perfectly true that "[w]hen the offense of conviction involves making a false statement, the inquiry to determine loss must focus on the amount of loss related to the false statement."  United States v. Wilson, 980 F.2d 259, 262 (4th Cir. 1992); United States v. Copus, 110 F.3d 1529, 1535 (10th Cir. 1997).  But the facts and circumstances of the instant case, in which defendant Solomon's false statement on the Medicare application directly lead to the losses caused by the subsequent false claims, can be distinguished from those in Wilson and Copus.  In Wilson, the defendant secured two loans from a bank in order to purchase a small furniture company, which began to lose money shortly after the loans were made.  Wilson, supra, 980 F.2d 259 at 260.  Seven months after the loans were made, the defendant filed a false financial statement with the bank, the crime for which he was convicted.  Id.  The Fourth Circuit held that the business losses were not related to the submission of the false financial statement to the bank because, at the time the business losses started to occur, no offense had been committed.  Id. at 262.  In Copus, in which the case was remanded for resentencing, the defendant's false

36

statement to the bank was also made after loans were issued. Copus, supra, 110 F.3d 1529 at

1535. The Tenth Circuit, applying Wilson, noted that the crucial question is what the bank

would have recovered had the false statement not been made. Id. The court noted that if the

defendant was forthright about the cattle he claimed to own, the bank could not have eliminated

its losses by foreclosing earlier. Id.

     Here, unlike in Wilson and Copus, defendant Solomon's offense of conviction, the false

statement on the application, occurred first and actually enabled the false claims to commence.

The defendant's false claims and the losses incurred by Medicare would not have occurred but

for the false statement made by defendant Solomon on BPS Medical's application. Thus,

defendant's false statement and his false claims are relevant conduct.

V.  Conclusion

Defendant Solomon is a recidivist.  In 1988 he was convicted for submitting false claims and for endangering patients by treating them without supervision.  Starting in 2002, he repeated the same conduct; this time obtaining more than $300,000 by his fraudulent conduct.  Defendant Solomon should be incarcerated for the maximum period permitted by the plea agreement - 13 months.[25]

Respectfully submitted,

Jeffrey A. Taylor
United States Attorney
D.C. Bar No. 498610

_____
Thomas E. Zeno
Assistant United States Attorney
D.C. Bar No. 348623
Kim Herd
Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W., Room 5243
Washington, D.C.  20530
(202) 514-6957

---

[25]  We wish to acknowledge the contributions of Michael Applebaum, a second-year student at The George Washington University Law School, in the preparation of this memorandum.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY certify that a copy of the foregoing Sentencing Memorandum was served via electronic filing on this 13th day of October 2006 to:


Mary Manning Petras
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004


_____
Thomas E. Zeno
Assistant United States Attorney